## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| LEROY WHITE | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | **5:02-CV-0524-KOB-JEO** |
| | ) | |
| MICHAEL HALEY, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION

### TABLE OF CONTENTS

I.      BACKGROUND. ................................................................................ 4

II.     INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS. ................................. 5

        A.      FACTUAL BACKGROUND. ................................................ 6

                1.      Facts surrounding the offense. ................................ 6
                2.      The capital nature of the offense. ............................9
                3.      Sentencing determination. ....................................10

        B.      INEFFECTIVE ASSISTANCE OF COUNSEL
                AT THE GUILT PHASE OF TRIAL (Claim II). ....................14

                1.      Preliminary matters. ..........................................14
                        a.      "Undisputed Facts". ...............................15
                        b.      "Critical Evidence". ...............................16
                2.      Alleged evidence showing reasonable doubt as to intent to
                        murder that was neither investigated nor fully presented by
                        trial counsel. .....................................................17
                        a.      Physical evidence at the crime scene. ...............17
                        b.      White's knowledge that the victim possessed a firearm. ..22
                        c.      White's recorded confession. ......................23
                        d.      Failure to review critically important evidence and
                                interview witnesses. ..............................27
                                i.      Witnesses Stella Lanier, Betty Eacho and
                                        Evelyn Steen. ........................27
                                ii.     Police officers. .......................32

iii.    Cumulative effect. ....................................................32

C.    DENIAL OF RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL
       DURING SENTENCING  (Claim III). .........................................33

       1.    Trial counsel failed to present evidence that refuted the
              aggravating factor that White knowingly created a
              great risk to of death to many persons. ...........................33
       2.    Trial counsel further rendered constitutionally
              ineffective assistance [at the sentencing hearing] by
              failing to challenge the arbitrary and capricious
              application of the "knowingly created a great risk of
              death to many persons" aggravating factor. ...............................33
       3.    Trial counsel failed to present evidence that the murder
              was not especially heinous, atrocious and cruel. .........................41
       4.    Trial counsel failed to present evidence that White was
              suffering from a severe mental or emotional disturbance
              at the time of the crime. ....................................................47
       5.    Trial counsel failed to present evidence refuting statements
              in the pre-sentence report. ..................................................52

D.    WHITE WAS DENIED EFFECTIVE ASSISTANCE OF
       APPELLATE COUNSEL (Claim IV). .........................................53

       1.    Appellate counsel was ineffective because he did not
              appeal the sentencing court's arbitrary and capricious
              use of the victim's fear at the time of the incident as a
              "heinous, atrocious and cruel" aggravating factor. .....................53
       2.    Appellate counsel was ineffective because he did not
              appeal the arbitrary and capricious application of the
              "knowingly created a great risk of death to many
              persons" aggravating factor. ...........................................55
       3.    Appellate counsel was ineffective for failing "to
              challenge on appeal or to brief numerous trial
              errors that deprived Leroy White of a fair trial" . .......................55
              a.    Failure to appeal trial court error. ....................................57
              b.    Failure to challenge improper prosecutorial
                    comments on appeal. ...........................................57
                    i.    Failure to testify. .................................................57
                    ii.   Failure to challenge Biblical references. ......................58
                    iii.  Failure to challenge the absence
                          of individual voir dire. ..........................................58
                    iv.   Failure to challenge improper jury instructions

regarding credibility of witnesses. ..........................59
v.      Failure to challenge the comment that White
        would kill again if not convicted. ...........................59
vi.     Failure to challenge numerous improper comments
        regarding the prosecutor's "personal opinion
        as to the guilt of the defendant."...............................60

III.    PROCEDURALLY DEFAULTED CLAIM. ..........................................................62

        A.      THE LAW. ...............................................................................................62
        B.      PURPORTED ARBITRARY AND CAPRICIOUS APPLICATION
                OF THE ALABAMA DEATH PENALTY STATUTE
                TO WHITE (Claim V). .........................................................................63

IV.     CONCLUSION. ..........................................................................................................64

Leroy White ("White" or "the petitioner") has filed an amended petition for writ of habeas corpus in which he listed eleven claims for relief from his state court capital murder conviction and death sentence.  (Doc.[1] 7).  *See* 28 U.S.C. § 2254.  Upon consideration, the court finds that the petition is due to be denied for the reasons discussed below.

I.   **BACKGROUND**

On motion and consent of the parties, the court bifurcated the petitioner's first claim ("Claim I")[2] from the remaining claims.  (Doc. 13).  On April 1, 2008, the undersigned entered a Memorandum Opinion and Order denying White relief as to Claim I.  (Docs. 25 and 26, respectively).

Thereafter, the court entered a scheduling order in which the petitioner and the respondent were directed to file an initial brief as to the remaining claims, with the petitioner being afforded additional time to submit a reply brief.  (Doc. 28).  The petitioner filed his initial brief, but listed only four remaining claims, which he identifies as "Counts II. - V."  (Doc. 29).  As such, only the four claims in the petitioner's initial brief shall be considered, and all other claims in the amended petition are deemed abandoned and are due to be dismissed.

The respondent filed a brief in response to the four remaining claims.  (Doc. 30).  The petitioner did not file a reply brief.

For some factual background and the procedural history of the case this court incorporates, and the reader is directed to review, the April 1, 2008, Memorandum Opinion ("Memo. Op. Claim I").  *See* (Doc. 25 at 1-16).  This court also incorporates by reference its

---

[1]References herein to "Doc." are to the document numbers assigned by the Clerk of the Court.

[2]Claim I alleged ineffective assistance of counsel concerning his decision to reject a plea offer.

comprehensive standard of review discussions pertaining to procedural default, statutory habeas

review and ineffective assistance of counsel as found in the Memorandum Opinion.[3]

## II.    INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

In Claims II, III and IV of his brief, the petitioner alleges his trial counsel was ineffective

at the guilt and penalty phases of trial, and his appellate counsel was ineffective on direct appeal.

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so

undermined the proper functioning of the adversarial process that the trial cannot be relied upon

as having produced a just result."  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  The

Supreme Court further elaborated as follows:

> A convicted defendant's claim that counsel's assistance was so defective
> as to require reversal of a conviction or death sentence has two components.  First,
> the defendant must show that counsel's performance was deficient.  This requires
> showing that counsel made errors so serious that counsel was not functioning as
> the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the
> defendant must show that the deficient performance prejudiced the defense.  This
> requires showing that counsel's errors were so serious as to deprive the defendant
> of a fair trial, a trial whose result is reliable.

*Id.* at 687.  To show ineffectiveness of counsel, a petitioner must demonstrate that his or her

attorney's performance fell below "an objective standard of reasonableness" (*id.* at 688), and that

"there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different" (*id.* at 694).  When making such an evaluation, "the court

should recognize that counsel is strongly presumed to have rendered adequate assistance and

made all significant decisions in the exercise of reasonable professional judgment."  *Id*. at 690.

---

[3]*See* Memo Op. Claim I (Doc. 25) Section II.A.– "Procedural Default," "The Law" at 17-19; Section III.A.
– "Habeas Corpus Review," "The Statutory Standard of Review" at 20-22; and Section III. B. – "Habeas Corpus
Review," "Ineffective Assistance of Counsel Standard" at 22-25.

The court must evaluate the effectiveness or ineffectiveness of counsel by consideration of the totality of the circumstances. *Stanley v. Zant*, 697 F.2d 955, 962 (11th Cir. 1983).

The second requisite element in a claim of ineffective assistance of counsel is a showing of prejudice. Even if counsel made an error so egregious as to be outside the broad scope of competence expected of attorneys, the petitioner can obtain relief only if the error caused actual prejudice. *See Strickland v. Washington*, 466 U.S. at 687. Prejudice means a reasonable probability that the outcome of the proceeding would have been different had the errors not occurred. The court will examine Claims II - IV against this standard.

A.     **FACTUAL BACKGROUND**

On direct appeal of this action, the Alabama Court of Criminal Appeals almost uniformly adopted the sentencing court's findings of fact and conclusions of law regarding the offense, conviction and sentencing. Reviewed collectively, the trial court's order affords a panoramic view of its factual findings. Such a view is necessary because many of the factual findings underlying counsel's alleged guilt phase ineffectiveness (a claim that revolves solely around evidence of White's intent to murder) and sentencing phase ineffectiveness (in particular, the finding of two aggravating factors) are material and relevant to each other. The facts hold the same relevance to White's allegations of ineffective appellate counsel, to the extent he raises the aforementioned underlying allegations against him.

1.     **Facts Surrounding the offense**

One factual finding made in this section on direct appeal was modified on collateral review. The petitioner and the respondent do not contest the validity of the modification and do not deny the State court relied upon the modification when conducting a merits review of

White's ineffectiveness claims. Thus, for clarity, the alteration will be addressed at the outset. The alteration also assists in this court's purpose – to determine whether White is entitled to habeas relief from the state court's rejection of his ineffectiveness claims. The rub of the change (highlighted *infra.*, in footnote 6) is that on direct appeal the sentencing court and the appellate court found that White ran out on the front porch of the victim's home and shot four times at Stella Lanier. On collateral review, however, the State court accepted that, while inside the house, White shot three times toward an open doorway as Stella Lanier ran out of the house, and only one time from the front porch. *See White v. State*, slip. op CR-98-0722 at 26 (Ala. Crim. App. April 21, 2000) (Tab[4] 65).

With this understanding, the trial judge's summarization of the facts surrounding the offense, as adopted by the Alabama Court of Criminal Appeals on direct appeal reads:

> "The victim in this case, Ruby White, was the estranged wife of the defendant, Leroy White. The parties had separated during the month of August or September, 1988, when Ruby White left the marital dwelling at 2217 Evans Drive, Huntsville, Alabama, and moved into a shelter for abused spouses. During previous difficulties between the defendant and his wife, the defendant had shot her in the leg.
>
> "Following their separation, Ruby White employed an attorney and filed a petition for divorce. A pendente lite hearing was scheduled at which time the defendant and Ruby White verbally agreed that the defendant would move out of the dwelling at 2217 Evans Drive and would allow Ruby White and her two children to return to the dwelling. The residence at 2217 Evans Drive was owned solely by Ruby White prior to her marriage to the defendant.
>
> "After her return to 2217 Evans Drive, Ruby White changed the door locks and her sister, Stella Lanier, moved in with Ruby and her two children. The

---

[4]References herein to "Tab" are to the tab numbers found in Respondent's document number 15. References herein to "C.R." are to the records of the State courts also found in document 15.

children were Brian Smith, age 16[5], son of Ruby White and a former husband [John Smith] and Latonia White, age 17 months, daughter of Ruby White and Leroy White.

"On the afternoon of October 17, 1988, the defendant, Leroy White, purchased a shotgun from Blue Springs Pawn Shop.  After purchasing the shotgun, he went to Larry's Pawn Shop and purchased some double-aught shotgun shells. After making these purchases, the defendant drove to the home of Ruby White at 2217 Evans Drive.  The testimony indicated that the defendant had been drinking alcoholic beverages during the day.  On his first arrival at the home on Evans Drive, the defendant pulled his car into the driveway and almost ran over his 17 month old daughter.  Stella Lanier observed this and the defendant and Stella got into an argument about his driving.  The defendant then placed his daughter in the car and drove off.

"At approximately 5:15 p.m. the defendant returned to the Evans Drive residence of his wife and exited his vehicle armed with a [12 gauge] shotgun and a [.38 caliber] pistol.  Ruby and Stella observed the defendant pull up and get out of his car with the shotgun and pistol.  They went into the house and locked the doors.  Brian Smith was sent to a rear bedroom by his mother and told to hide under the bed. Latonia White was still in the defendant's car.

"The defendant then came up to the front door of 2217 Evans Drive and finding it locked, shot the glass out of the storm door and shot the lock off the wooden front door.  He then kicked the door open, entered the house and began to scuffle with Ruby and her sister, Stella.  As Stella tried to flee the house, the defendant ran out on the front porch and shot four times.[6]  Stella fell in the yard [having been wounded in her right arm and right leg].

"The defendant then went back in the house and confronted Ruby who was begging and pleading for her life.  After a brief confrontation, Ruby ran out into the front yard at which time the defendant told her to stop or he would blow her legs off.  She stopped and the defendant confronted her with the shotgun.  Ruby grabbed the barrel of the shotgun and continued to plead for her life.  Her daughter

---

[5]Although pointed out by neither party, this individual at the time of trial identified himself as 12 year old "Brian Garner," the son of Ruby White and John Smith.  (C.R. Vol. 2 at 279).  He also testified that he had a 16 year old brother named Eric Smith.  *Id.* at 280.

[6]On collateral review, the Alabama Court of Criminal Appeals again adopted the post-conviction court's findings of fact, which read: "'[White] contends . . . he fired three shots in the direction of an open door . . . [and one shot] in a yard full of people, . . . [where it] came to rest in the victim's leg."  (C.R. Vol. 24, Tab. 56 at 26) (citation to Rule 32 petition omitted by this court).  The court then accepted White's contention that he "fired three rounds toward the open doorway."  *Id.*

Latonia was in the defendant's car and her son Brian was in the house.

"Finally, the defendant shoved Ruby away from the gun and fired at her at point blank range with the double-aught buckshot. The blast tore the flesh from her right arm as she tried to shield herself and the pellets penetrated her chest and abdomen. Ruby fell to the ground moaning but she was not dead. Testimony revealed that the defendant then went back into the house and called for Brian to come out of his hiding place. When Brian came out, the defendant told him to tell his daddy that '... when I get out of this, I'm going to kill him, too.'

"The defendant then went back outside, walked up to where Ruby lay on the ground moaning and said, 'Bitch, you ain't dead yet.' He then went to his car, re-loaded the shotgun, picked up his 17 month old daughter and walked back over to where Ruby lay on the ground. As he placed the muzzle of the shotgun to her neck, he said, 'Bitch, this is the last thing you will see.' He then smiled and pulled the trigger.

"The blast tore a hole in Ruby's neck where the gun shot entered and blew off the back side of her head where it exited.

"At this time, the police arrived and the defendant surrendered without incident."

*White v. State,* 587 So. 2d 1218, 1222-23 (Ala. Crim. App. 1990) (bracketed portions in original).

## 2.     The capital nature of the offense

With regard to whether White premeditated the murder of his wife, the appellate court

held:

The evidence shows that the defendant deliberately planned and prepared to kill his wife that afternoon before he ever arrived at her residence.

"The law has declared, and can declare, no length of time, within which the man-slayer must deliberate, or premeditate, to raise the offense to the highest grade of homicide, murder in the first degree. If the mind reasons about, or resolves upon the act, before committing it, or if the purpose be formed, no matter for how brief a period, on an event then future, or on a contingency that may happen, to use a deadly weapon, this is deliberation, premeditation; and a homicide, committed pursuant thereto, is murder in the first degree."

*Ex parte Brown*, 65 Ala. 446, 447-48 (1880).

*White,* 587 So. 2d at 1230.

### 3.    Sentencing determination

Finally, much like its opinion summarizing the facts surrounding the offense, the

Alabama Court of Criminal Appeals adopted and affirmed the trial judge's sentencing

determination.  While the following excerpts do not include all of the factual findings made in

the sentencing process, the excerpts do include the affirmation of the sentencing court's findings

regarding the heinous, atrocious or cruel aggravating ("HAC") factor and the knowingly created a

great risk of death to many persons aggravating factor, both of which contain important

information regarding issues addressed in this Memorandum Opinion.  The portion of the

appellate court opinion regarding the HAC factor reads:

> The trial court properly found as an aggravating circumstance, under
> § 13A-5-49(8), the fact that the defendant's conduct "was especially heinous,
> atrocious and cruel."  In this regard, the trial court found:
>
> > "The Court reaches this conclusion [that the capital offense
> > was especially heinous, atrocious and cruel compared to other
> > capital offenses] based upon the following evidence:
> >
> > "a.  The victim of this crime was completely defenseless
> > and was begging and pleading for her life during the commission
> > of the offense.
> >
> > "b.  The children of the victim were present when the
> > killing occurred and certainly the victim suffered extreme concern
> > for their safety as evidenced by her instructing Brian to hide under
> > the bed.
> >
> > "c.  The victim witnessed the apparent killing of her sister
> > prior to her own death.
> >
> > "d.  The victim obviously realized that it was the

defendant's intent to kill her when she saw him drive up and exit his car armed with a pistol and a shotgun.  Even though she locked the doors, this did not prevent his entry into the dwelling.

"e.  The victim obviously suffered extreme pain when she was initially shot by the defendant.  This gun blast removed the flesh from the bone of her right arm and the pellets which entered her body, according to the testimony of the forensic pathologist would have caused extremely severe pain.

"f.  After inflicting this obvious severe injury to the victim, she was left lying on the ground while the defendant entered the house to confront her minor child, Brian Smith.

"g.  The most brutal aspect of the defendant's conduct occurred when, after he realized the victim was not dead, he calmly went to his car, re-loaded the shotgun and returned to the severely wounded victim with their 17 month old daughter in his arms and said to her, 'This is the last thing you will see.'

"The Court finds that this was a conscienceless and pitiless killing which was unnecessarily torturous.  By any standard acceptable to civilized society, this crime was extremely wicked and shockingly evil.  It was perpetrated under circumstances which had to cause a high degree of pain to the victim and the evidence indicates that there was utter indifference on the part of the defendant to this pain.  The Court recognizes that all capital offenses are heinous, atrocious and cruel to some extent, but the degree of heinousness, atrociousness and cruelty which characterizes this offense exceeds that which is common to all capital offenses."

In open court at the conclusion of the sentencing hearing, the trial court stated:

"This wasn't just a killing.  It had to be a horrifying and terrifying experience for your wife to see you drive up, get out of your car with a shotgun and a pistol.  I think that is evident from what she did and what her sister did when they saw you, and that was to go in the house and lock the door and send her child to hide under the bed.  I think that is evidence that she knew what was happening.  As I stated, that had to be a horrifying and terrifying experience.

"It had to be a horrifying and terrifying experience to her

11

when you shot the door off, when you shot the lock off the door, and kicked it open.  You then went in and confronted your wife.  As I recall, you fired the shotgun[7] at her sister, or fired it down the hallway.  When Stella Lanier tried to flee the residence you went out on the porch and shot at her and, according to what testimony you believe, you shot up to four times.  She fell in the yard.  Your wife witnessed that.  You then went back in the house and confronted her and, although I don't recall the exact words that you said, it was something to the effect that, 'You have made me kill your sister,' or 'I have had to kill your sister, and now I have got to kill you.'  It was some words to that effect.  With her standing there begging and pleading for her life, with her child in the bedroom hidden under the bed, and your child out in the car, she then tried to flee the residence, obviously terrified.  She ran out in the yard, whereupon, as I recall, you told her to stop or you would shoot her legs off.  Then you confronted her in the yard.  With her begging and pleading for her life, she grabbed the shotgun, as I recall, the barrel of it, and eventually you shoved her away and at point blank range fired a shot.  That gun with double 0 buckshot tore the flesh from her arm and the pellets penetrated her body in areas, according to the forensic pathologist, that would cause extreme pain to her.  She fell to the ground moaning.  She was not dead at that point.  I don't think that's disputed.

"You left her lying in the yard and went back in the house.  At this point we will never know whether she was conscious of what you were doing or not.  She may have been.  She may have seen you go back in the house where her child was hiding under the bed.  You confronted her son and made your statement to him concerning what you were going to do to his father.

"You then came back out.  You realized that she was not dead.  In the presence of her daughter and other people there in the neighborhood, and with her lying on the ground, mortally wounded, in pain, completely defenseless, you placed the shotgun at her neck and pulled the trigger.  If that is not especially heinous or atrocious and cruel, I don't know what is.'

The findings of the trial court are fully supported by the testimony and

---

[7]Actually, White shot the pistol at his sister-in-law.  Since the written sentencing order indicates the trial judge understood the weapon was a pistol, not a shotgun, it appears the court simply spoke incorrectly during oral sentencing.

evidence and fully justify the finding of this aggravating circumstance.

Pursuant to and following our decision in *Bui v. State*, 551 So. 2d 1094, 1119-20 (Ala. Cr. App. 1988), *affirmed*, 551 So. 2d 1125 (Ala. 1989), we find that the application of the aggravating circumstance that the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses was both proper and constitutional under the facts of this case.  Evidence as to the fear experienced by the victim before death is a significant factor in determining the existence of the aggravating circumstance that the murder was heinous, atrocious, and cruel.  *Ex parte Whisenhant*, 555 So. 2d 235, 243-44 (Ala. 1989), *cert. denied*, 496 U.S. 943, 110 S. Ct. 3230, 110 L. Ed. 2d 676 (1990).

*White*, 587 So. 2d at 1232-34.

Regarding the knowingly-created-a-great-risk-of-death-to-many-persons aggravating

factor, the appellate court opinion reads:

The trial court was correct in finding as an aggravating circumstance the fact that the defendant knowingly created a great risk of death to many persons under Ala. Code 1975, § 13A-5-49(3).  The finding of the trial court in this regard is stated in the following portion of the trial judge's "findings concerning the existence or non-existence of aggravating circumstances."

"The evidence in this case indicates that the defendant indiscriminately fired a shotgun into an occupied dwelling containing not only the victim but two other people.  The evidence also indicates that the defendant fired the pistol out in the front yard in a residential neighborhood where many other people were present.  The Court finds that the defendant's conduct in the indiscriminate firing of these weapons did, in fact, create a great risk of death to many other people."

In addition to the written findings of the trial court, in imposing the sentence of death, the trial court stated in open court at the conclusion of the sentencing hearing:

"In this case the evidence at the trial was to the fact that you were firing a shotgun with double O buckshot in it and a pistol rather indiscriminately into a house that was occupied by several people.  You shot that pistol and shotgun in the yard and neighborhood where other people were present.  That does to me appear to be evidence of that aggravating circumstance."

13

The defendant's argument that "the only persons who were in danger of 'great risk of death' were the two women who were actually injured," Appellant's brief at 120, is without factual support and is contrary to the facts of this case.

The evidence fully supports the trial court's findings and the application of this aggravating circumstance.  See *Edwards v. State*, 515 So.2d 86, 92-93 (Ala. Cr. App. 1987).

*White*, 587 So. 2d at 1232.

**B.     Ineffective Assistance of Counsel at the Guilt Phase of Trial (Claim II) (Doc. 29 at 9-26)**

This court has already determined that White cannot establish he is entitled to 28 U.S.C. § 2254(d) relief from the allegations underlying this claim.  *See* Memo. Op. Claim I (Doc. 25) at 44-45.  Accordingly, the claim is due to be denied.  However, because the petitioner has further addressed the same in his subsequent filings, the court will more fully discuss the same.

**1.     Preliminary matters**

White alleges trial counsel failed to investigate and fully present exculpatory crime scene evidence that would have refuted or impeached the specific intent element of the capital murder charge against him, thereby supplying reasonable doubt as to his guilt.  (Doc. 29 at 9-11).  Before engaging in a detailed discussion of this evidence, the court makes an initial finding that with few exceptions, all of the purportedly exculpatory/impeachment evidence trial counsel allegedly failed to investigate and present was indeed presented in some form to the jury at the guilt phase of trial.  Thus, in large part, White is simply "arguing the facts" presented at trial, the evidentiary value of which has already been decided by the jury by virtue of his conviction for capital murder.  This finding almost completely obviates his claims of ineffectiveness at the guilt phase of trial, although White declares trial counsel also failed to *fully* present the evidence to the jury.

14

In any event, White divides the allegations supporting this claim into two sections.  In the first section he asserts the "undisputed" facts.  *Id*. at 12-13.  The second section includes the critical evidence he declares demonstrated that he intended only to confront his wife and not to kill her.  *Id*. at 12-19.

### a.    "Undisputed Facts"

White alleges numerous "undisputed facts underlying the criminal event,"  and then proceeds to set out his version of allegedly undisputed facts, with no citations to the record and no indication as to whether these facts were presented at trial or on collateral review.  *Id.* at 12.  Since "habeas corpus review exists only to review errors of constitutional dimension," a habeas corpus petition must meet the "heightened pleading requirements [of] 28 U.S.C. § 2254 Rule 2c."  *McFarland v. Scott*, 512 U.S. 849, 856 (1994) (other citations omitted).  The court seriously questions whether White's allegations are sufficient to satisfy federal pleading requirements.  28 U.S.C. § 2254, Rule 2(c)(1)(2)(3) of the *Rules Governing Section 2254 Cases*.

Regardless of White's characterization of the facts as "undisputed," pursuant to 28 U.S.C. § 2254(e), the state court's factual findings are entitled to a presumption of correctness.  In the habeas context, the petitioner bears the burden to overcome that presumption by clear and convincing evidence.  Therefore, to the extent White's "undisputed" facts and the inferences therefrom comport with the state court's factual findings, no additional commentary is necessary.  Conversely, if the state court's factual findings are inapposite to any fact or inference White contends is "undisputed," the state court's determination will control this court's inquiry, unless White presents specific evidence and argument sufficient to overcome the deference owed to the

15

state court's factual findings both on direct and collateral review.

### b.    "Critical Evidence"

Next, White alleges that critical evidence refuting his intent to murder the victim was available that, but for his inadequate investigation, counsel readily could have found and presented to the jury.  (Doc. 29 at 13-17).  This evidence was derived from physical evidence at the crime scene, White's knowledge that the victim possessed a firearm, information contained in White's recorded confession to law enforcement, as well as testimony and statements from witnesses and police.  *Id.* at 11-24.[8]  Had this evidence been placed before the jury, White asserts a "reasonable probability" that "the individual and cumulative effect" would have been an "acquittal on the capital murder charge."  *Id.* at 24-25.  In other words, had the jury heard the evidence, it would have found that White "did not form the intent to commit murder until after he had exited his wife's home and confronted her on the front lawn," thus absolving him of guilt of the capital murder offense.  *Id.* at 25.

The petitioner believes he is entitled to habeas relief from the state court's rejection of the claim because "[t]he State Court made unreasonable factual determinations . . . based on the evidence presented and unreasonably applied *Strickland* and its progeny."  *Id.* at 25 (emphasis supplied).  Specifically, White contends the state court "merely focused on the existence of evidence that supported the jury's ultimate findings without considering this evidence in light of

---

[8]White also asserts that counsel's failure to investigate, discover and present this "potentially exculpatory evidence also constituted deficient performance with respect to jury's [sic] finding of aggravating circumstances under Alabama law."  (Doc. 29 at 11).  Such an allegation is conclusory, and due to be dismissed on that basis. Alternatively, it is without merit for the reasons set out in the body of this section of the memorandum opinion and also because the jury recommended by a vote of 9 to 3 that White be sentenced to life without parole.  (C.R. Vol. 4 at 652).  For the foregoing reasons, this claim is due to be dismissed, or in the alternative, due to be denied on the merits.

the other evidence that could that could have been presented." *Id.* at 25-26.  In doing so, the state

court "turned . . . *Strickland* . . . on its head . . ." because it "disregarded the effect this evidence

would have had on the jury" when it determined there was a "reasonabl[e] probabilit[y] that the

result would have been the *same*." *Id.* at 26 (emphasis in original).

   The respondent argues that White has not demonstrated that the state court's decision was

contrary to or an unreasonable application of Supreme Court case law or that any factual finding

is invalid.  (Doc. 30 at 21-43).

> **2.     Alleged evidence showing reasonable doubt as to intent to murder
> that was neither investigated nor fully presented by trial counsel**
> (Doc. 29 at 9-26).

> **a.     Physical evidence at the crime scene**

   The petitioner initially alleges that crime scene evidence shows he "did not point a gun

that could be fired at Ruby White until they had their final confrontation *outside of the house* in

the driveway of the White residence." *Id.* at 13 (emphasis by the petitioner).  He sets out

"specific[]" evidentiary points he contends support his assertion, which are summarized below:

> • The shotgun was "functionally unloaded" upon entering the house,
> and the petitioner did not point or fire the shotgun at the victim
> while in the house.

> • The petitioner did not point or fire the pistol at the victim.

> • The petitioner pumped (functionally loaded) the shotgun after
> exiting the house, and then used it to kill the victim.

*Id.* at 14-16.

   The above information is identical in form and substance to that contained in the claim as

it was raised in the Rule 32 petition. *See id.* at 14-16 and (C.R. Vol. 12, Tab. 53 at 11-13 (Rule

32 petition)).  Because the Alabama Court of Criminal Appeals made findings of fact and

conclusions of law in its adoption of the Rule 32 court's order denying the claim on collateral

review, analysis begins with the pertinent portions of state appellate court's opinion.  It reads:

> White claims that trial counsel failed to investigate evidence from the
> crime scene that would have corroborated the defense theory that White had no
> intent to commit a crime when he entered the victim's house.  White argues that
> Gladden could not effectively present a "no murderous intent" defense because he
> had never investigated . . . the crime scene evidence before trial.
>
> White's assertion that Gladden did not investigate the evidence from the
> crime scene is not supported by the record.  Gladden met with White and he met
> with police officers who had been at the crime scene.  Gladden read the police
> reports, reviewed the District Attorney's file; viewed the physical evidence,
> photographs, drawings, and diagrams concerning the crime scene; and reviewed
> witnesses statements.[9]

*White*, slip op. CR-98-0722 (Tab 65) at 14.

The appellate court also found the circuit court had properly addressed White's "'no

murderous intent' argument," and quoted the following directly from the circuit court's order:

> "White claims that if Gladden had conducted an 'adequate pre-trial
> investigation,' he would have discovered evidence which 'demonstrated that
> White intended only to confront his wife regarding the argument that White had
> previously had with Stella Lanier and generally, regarding the demise of their
> marriage.'  Moreover specifically, he asserts the following:
>
>> "'White took no action to harm Ruby White when he was
>> inside the White residence on October 17, 1988.  White fired the
>> shotgun three times in order to open the front door of the marital
>> residence.  The third and fourth shotgun shells were found far away
>> in the driveway near the place where Leroy White and Ruby White
>> had their final confrontation after White had exited the White
>> residence.  This evidence demonstrates that Leroy White fired his
>> shotgun twice into the front door and ejected the shells.  When

---

[9]White concedes that trial counsel read the police reports, listened to his tape recorded confession and met with him "on a few occasions."  (Doc. 29 at 11).  He makes no effort, however, to overcome the presumption of correctness owed the state court's findings.

Leroy White fired a third time into the front door and the door
finally opened, he did not pump the shotgun to move the fourth
live shotgun shell into the firing chamber.  Put another way, Leroy
White entered the White residence with a functionally unloaded
gun.'

"(Consolidated, Restated and Fourth Amended Petition at 11-12)  The
Court finds that White is not entitled to any relief pursuant to this claim.

"Initially, White has failed to show that Gladden's failure to
present this evidence constituted deficient performance.  As noted
[elsewhere in this opinion[10]], Gladden made a reasonable and
strategic decision to take the case in a particular direction after
meeting with his client and investigating the evidence.  The fact
that he did not contrive an argument based on the placement of the
spent shotgun shells, does not make his performance deficient.
'The test for ineffectiveness is not whether counsel could have
done more; perfection is not required.'  *Waters v. Thomas*, 46 F.3d
1506, 1418 (11th Cir. 1995) (citing *Atkins v. Singletary*, 965 F.2d
952, 960 (11th Cir. 1992) ('Trial counsel did enough.  A lawyer
can almost always do something more in every case.  But the
Constitution requires a good deal less than maximum
performance.').  As White has failed to prove deficient
performance as to this issue, his claim is due to be denied.

"Alternatively, even assuming deficient performance,
White has failed to show that he was prejudiced by Gladden's
failure to investigate and present a defense based upon a
'functionally unloaded' shotgun theory.  In order to do so, White
must show 'that there is reasonable probability that, but for
counsel's unprofessional errors, the results of the proceeding
would have been different.  A reasonable probability is a
probability sufficient to undermine confidence in the outcome.'
*See Funchess v. Wainwright*, 772 F.2d 683, 688 (11th Cir. 1985).
White has failed to make the required showing.

"The Court notes that, in addition to the shotgun, White
entered the house with a fully loaded pistol.  In his petition for

---

[10]The appellate court is referring to its adoption of the circuit court's rejection of the claim that eventually
became known as Claim I of the habeas petition.  As stated *supra.,* Claim I was bifurcated from the claims reviewed
in this opinion, and a decision rejecting habeas relief for Claim I already has been made.  *See* (Doc. 25).  In denying
Claim I, this court also incorporated the same information (*id.,* at 6-12) "noted" by the appellate court above.

19

relief, White contends that '[n]o evidence exists that [he] pointed or fired the pistol he had with him at Ruby White.' White's contention is only partially correct. While there was no evidence that White fired the pistol at the victim while in the house, there was evidence that he threatened her with a weapon immediately upon entering the home. Stella Lanier testified that the victim was begging for her life, clearly an indication that she felt threatened for some reason. (R. 122) More specifically, Lanier stated that 'I heard my sister asking him to please not shoot her, and I heard him say that he had to because she had [messed] up his life.' (R. 122) The Court finds this to be strong evidence that White was pointing a weapon at the victim and that he entered the home with the intent to kill.

"Additional evidence of White's intent, prior to entering the home, is the fact that he immediately exited his car armed with two deadly weapons. He did not retrieve the weapons after determining that he was locked out. In fact, the evidence showed that the door was locked due to the fact that White was seen getting a gun out of his car. (R. 119-120) Moreover, this was a shotgun that, by his own admission White had purchased for the very purpose of killing and/or doing bodily harm to his wife and her ex-husband. (R. 370, 378) The shotgun was functional and loaded with double 0 buckshot that White had purchased that very afternoon. Contrary to White's claims, double 0 buckshot are filled with large shot and are not 'consistent with small game hunting.' (R. 340-41) White's claim that 'consistent with his lifelong pursuit of hunting,' he purchased 'buckshot ammunition appropriate for hunting birds and small animals' is directly refuted by the type of ammunition in question.

"The Court finds that all of the evidence, including White's own statements, drastically contradicts the claim that 'he did not intend to kill anyone but intended only to confront his wife.' White's assertion that the 'functionally unloaded' shotgun theory would have refuted the contrary evidence and 'raised reasonable doubt in the question of whether White had the requisite intent to murder was one for the jury. As evidenced by the verdict rendered, the jury found that White intended to commit murder upon entering the home. There can be no reasonable finding that a 'functionally unloaded' shotgun theory would have changed that verdict. Therefore, these claims are denied."

C.R. 1731-1734.

>We cannot find error with the circuit court's finding regarding this claim.
>For the reasons stated in the circuit court's order we find that trial counsel was not
>deficient in this regard, nor did White suffer prejudice.

*White*, slip op. CR 98-0722 (Tab 65) at 15-17.

After careful examination, this court finds that the state court's decision is neither

contrary to or an unreasonable application of clearly established federal law, nor is it based upon

an unreasonable determination of the facts in light of the evidence before it.  As for the shotgun,

White has not overcome the presumption of correctness accorded the state court's finding that

the shotgun was functional - even if the fourth round was not pumped into the firing chamber

until he exited the house.  In short, it was not unreasonable for the court to find that a loaded,

working shotgun was indeed a functional weapon.  As for pointing a weapon at the victim while

in the house, White alleges only that no evidence was produced at trial showing that he did so,

and does not allege that he did not point a weapon at the victim.  (Doc. 29 at 11-13).

Considering his behavior before entering the home and while in the home, the state court's

finding that White pointed a weapon at Ruby White during that time period is not unreasonable.

This is particularly true due to the fact that she (Ruby White) was begging for her life, and

petitioner does not contend that the weapon was not visible while the petitioner was inside the

residence.

Next, with all of the other events surrounding the murder in mind, it is highly unlikely the

jury would have considered the functionally unloaded shotgun theory in White's favor –

regardless of whether the fourth shell was pumped into the firing chamber after exiting the house.

The question of whether White did or did not point a weapon at the victim in the house also

would not have impressed the jury.  In fact, when all other factual findings made by the state

court are considered, both theories are extremely weak.  Thus, the state court's determination that counsel was not objectively deficient for not offering these theories is neither contrary to nor an unreasonable application of clearly established federal law.  The state court's prejudice inquiry is entitled to equal legal deference because petitioner presented no reasonable likelihood that White's "functionally unloaded" shotgun or weapon pointing theories would have raised a reasonable doubt as to his intent to murder the victim before he ever entered her home, and thus would not have changed the outcome of his trial, even if the theories had been presented.  This claim is due to be denied.

### b.   White's knowledge that the victim possessed a firearm

White next alleges that trial counsel failed to "ascertain" and argue that he "knew that Ruby White owned a gun," and that he was armed when he entered the White residence because "he feared what his wife or sister-in-law would do and not because he intended to murder Ruby White."  *Id.* at 17-18.  The respondent does not mention this portion of the petitioner's claim in its brief, nor does the Alabama Court of Criminal Appeals' opinion on collateral review. However, White apparently did not raise this claim in his initial brief on collateral appeal,[11] and referenced it in only three sentences[12] of his reply brief.  White's failure to properly raise the claim on collateral appeal renders it procedurally defaulted for federal habeas purposes. Therefore, the claim is due to be dismissed.

Even if it were not procedurally barred from substantive review, the claim is due to be denied on the merits.  The last state court to review this claim on the merits was the Rule 32 trial

---

[11]*See* Rule 32 C.R. Vol. 23 (Tab 60).

[12]*See* Rule 32 C.R. Vol. 24 (Tab 62) at 11.

court, and it made the following findings of fact and conclusions of law:

>          . . . .  Probably the most difficult task one would face in asserting this
> defense would be convincing a jury that a man, who is armed with two fully
> loaded weapons and who has just blown the front door off, was acting in self-
> defense.  Even disregarding that factor, however, this claim is without merit.
> "[T]he Alabama legislature has already rejected the 'imperfect defense' doctrine. .
> . ."  *McCollum v. State*, 678 So. 2d 1210, 1214 Ala. Crim. App. 1996), *cert.
> denied*, 678 So. 2d 1210 (Ala. 1996).  White has failed to prove either deficient
> performance or prejudice . . . .

(C.R. Vol. 14 (Tab. 58) at 26 (Rule 32 order)).

The decision of the state court is neither contrary to nor an unreasonable application of

clearly established federal law, nor is it based upon an unreasonable determination of the facts in

light of the evidence before it.[13]  White concedes he spoke with counsel several times before trial,

but never alleges he informed counsel of the facts underlying this purported defense.  Nor does

he deny that Alabama has rejected an "imperfect self-defense" as a viable legal defense.  As such,

his conversations with counsel aside, such a defense is not even available under Alabama law.

Counsel cannot be objectively deficient nor can White be prejudiced by counsel's failure to raise

a non-existent defense.  This claim is due to be dismissed as procedurally defaulted, or in the

alternative, due to be denied on the merits.

### c.      White's recorded confession

White also alleges trial counsel did not obtain a copy of his tape-recorded statement to the

police in preparation for trial, waited until the day before or the day of trial to listen to the tape,

and then "waited until the second day of trial to challenge the confession."  (Doc. 29 at 18-19).

According to White, in the confession he "stated that he never intended to harm anyone on

---

[13]This court's decision would be the same even if were exercising *de novo* review of the claim.

October 17, 1988," a statement which was "corroborated by the physical evidence" at the scene. *Id*. at 19.  White does not describe the corroborative physical evidence to which he refers.  In any event, he argues the evidentiary combination would have "rebutted the State's premeditation and burglary" allegations and "would have raised reasonable doubt" as to the capital murder charge. *Id*.

In denying this claim on collateral review, the Alabama Court of Criminal Appeals made findings of fact and conclusions of law, which read as follows:

> After the shooting, White gave the police two statements, a written statement and an audiotape statement.  A concise explanation of White's statements can be gleaned from the testimony taken from homicide Investigator Mickey Lee Brantley of the Huntsville police department.
>
> > "Q. [Gladden]: Now, Leroy [White] told you during the interview that he had obtained the gun to do bodily harm, not to kill anybody, didn't he?
> >
> > "A. [Brantley]: He said bodily harm in the taped statement. In the [written] statement he said kill them.
> >
> > "Q. He also told you that he did not have any intention of shooting anybody on that particular day until certain events happened, didn't he?
> >
> > "A.  Well, he said he went and bought the gun for the purpose of killing them [Ruby White and her ex-husband, John Smith].  Then during the taped interview he said he bought it do bodily harm.[14]  Then he said he really wasn't wanting to do it that

---

[14]The following dialogue between White and Brantley was recorded in White's oral statement, which was played before the jury at the guilt phase of trial:

Mr.  Brantley: Okay.  At this time, Mr. White, I would like for you to tell me what occurred tonight out on Evans Drive.  I would like for you to begin from the beginning there.  First off, about going to get the shotgun.  Where did you get that shotgun?
Mr. White: Blue Spring Pawn Shop.
Mr. Brantley: Okay.  What was the reason for buying that shotgun?
Mr. White: I bought it for my wife and her ex-husband.
Mr.  Brantley: You bought it for them?

day.[15]

> "Q.  He told you he didn't have any intention of doing anything that day until certain events happened with Stella.  Is that what he told you?
>
> "A.  He said when he was in the church parking lot he got madder as he sat there and thought about it.

C.R. 2165-2166.

Gladden testified that he knew what was on the tape before he listened to it.

> "I knew what was on it.  I just didn't know how it sounded; how Leroy sounded on it before that date.  I knew what was on it before that date, and I wasn't surprised at its content and manner."

C.R. 2755.

The circuit court ruled as follows regarding this claim.

> "White contends that Gladden rendered ineffective assistance in listening 'to the taped confession either on the day of trial or the day before trial.'  (Petition for Relief at p. 15.)  He claims that '[h]ad trial counsel timely listened to the confession and investigated his contents, he would have discovered that it

---

Mr. White: Yes.
Mr. Brantley: For what purpose?
Mr. White: To do bodily harm to them.

(C.R. Vol. 2 at 378).

[15]Dialogue between Brantley and White in the tape recorded statement played before the jury reads:

Mr. Brantley: Did you intend on killing Ruby?
Mr. White: Yeah, after I had shot her sister.
Mr. Brantley: In other words, you meant to kill Ruby?
Mr. White: Yeah.
Mr. Brantley: Could you have been planning on doing this?
Mr. White: Well, it kind of was on my mind, but - - I didn't really plan on nothing like this, not today anyway.  After her sister [Stella], you know come and talked to me like she did, it kind of made me angry.

(C.R. Vol. 2 at 384-85)(bracketed portion added).

contained evidence that also rebutted the State's claims of premeditation and burglary.' (Id.) Initially, Gladden testified that, while he did not listen to the tape until just prior to trial, he was aware of its contents early in his investigation. (Gladden 1994 Depo. at 218) The Court does not condone Gladden's actions in not obtaining a copy of the tape earlier in his preparation. Even assuming deficient performance, however, White has failed to prove that he was prejudiced by Gladden's inaction. He asserts that '[h]ad trial counsel uncovered this evidence and argument found in White's confession and presented it to the jury at trial it would have refuted the State's charge that White entered the White residence with the intent to murder Ruby White.' (Petition for Relief at 15) While the court disagrees with White's characterization of his taped confession as containing exculpatory information, the important point is that the tape was properly admitted into evidence. Therefore, the jury heard whatever portions White contends 'would have raised reasonable doubt in the minds of jurors.' (Id.) Since the jury was privy to the evidence White claims Gladden should have presented, his claim is denied.

C.R. 1735-1736.

The record supports the circuit court's findings regarding this claim. Because Gladden testified that he knew what was said on the tape, his failure to listen to the tape before trial did not constitute deficient performance. To any extent that the tape contained exculpatory evidence, a finding that we are not making, the jury heard it. We cannot find error with the circuit court's finding regarding this claim. We agree with the circuit court that White did not suffer prejudice due to Gladden's failure to review the audio taped confession before trial. Thus, counsel was not ineffective.

*White*, slip op. CR 98-0722 (Tab 65) at 19-20.

White does not dispute that trial counsel was aware of the substance of his confessions before trial. White also does not dispute that his taped confession was played before the jury. Finally, he does not dispute that trial counsel cross-examined the homicide detective regarding his assertion that White orally stated he intended to kill his wife and then contrasted it with the substance of White's recorded statement. Therefore, his allegation that counsel failed to uncover and "present fully" the contents of the tape to the jury is without merit. (Doc. 29 at 19). The jury

listened to contents of the tape and decided for itself whether to believe White intended to murder the victim.  The state court's reasoning is neither contrary to nor an unreasonable application of *Strickland* and its progeny, nor is it based upon an unreasonable determination of the facts in light of the evidence before it.  This claim is due to be denied.

> **d.      Failure to review critically important evidence and interview witnesses**

White also alleges that trial counsel was ineffective for "failing to interview *any* of the numerous fact witnesses or police officers responding to the scene."  (Doc. 29 at 9) (emphasis by the petitioner).  He never describes the individuals who should have been interviewed, what he would have discovered in conversations with them, or how the verdict in his case would have been affected.  Accordingly, this aspect of the claim is due to be dismissed, or in the alternative, denied for failing to state a claim upon which relief can be granted.  He does, however, assert that trial counsel failed to investigate statements given by Stella Lanier, Betty Eacho and Evelyn Steen.  *Id*. at 20-24.

> **i.      Witnesses Stella Lanier, Betty Eacho and Evelyn Steen**

In view of the petitioner's challenge to the statements of Lanier, Eacho and Steen, and the fact that the state court addressed White's allegations concerning these witnesses collectively, this court will do so as well.  Regarding Stella Lanier, White declares that trial counsel failed to investigate statements given by her to Huntsville police after the murder in which she "did not report" that the petitioner made "any verbal threat to harm or kill Ruby White while inside the White residence."  *Id.* at 20-21.  Yet at trial, Lanier "testified that White had made such threats." *Id*.  According to the petitioner, had trial counsel properly investigated Stella Lanier's pre-trial statement, he could have "cross-examine[d] her about the material change in her version of the

27

incident" in an effort to show that she "altered" it "only after the State had re-indicted White on a capital murder charge that required that the State to prove that White entered the White residence with the intent to murder Ruby White." *Id*. at 21.

Next, White complains that counsel failed to investigate Betty Eacho's pre-trial statements to police. *Id.* Had counsel done so, the petitioner asserts that he would have been able to show that Ms. Eacho did not provide a statement to police until two days after Ruby White's death, that she was impaired due to intoxication at the time of the event, and that her testimony of the events was exaggerated – particularly her declarations that "stray bullets were going everywhere," that she heard White threaten to kill the victim and say, "'Bitch, you ain't dead yet,[16]' before shooting Ruby White a second time." *Id*. at 21-23.  White asserts that Eacho's testimony regarding his verbal statements was incredible because of her distance from the event and because three other witnesses (Stella Lanier, Evelyn Steen and Gloria Garner) were all closer to the event than Eacho and "none of them testified that White threatened anyone." *Id*. at 21.

Finally, White contends that had counsel investigated Ms. Steen, he could have shown the jury that her judgment was impaired due to intoxication as well. *Id.* at 23.

On collateral review, the Alabama Court of Criminal Appeals affirmed the trial court's decision to deny White relief as to this claim.  It held:

> White contends that the circuit court erred when it ruled that trial counsel was not ineffective for failing to investigate the statement given to police by Betty Eacho, while counsel attempted to attack her veracity at trial in order to negate the State's "murderous intent" charge.  We disagree.  The circuit court ruled as

---

[16]The petitioner asserts that "[n]o other witness testified at trial that White made these statements." *Id*. at 21.  Actually, Evelyn Steen testified at trial that she heard White make this statement as well.  (See C.R. Vol. 1 at 181).

follows concerning this claim.

> "White asserts that Gladden 'rendered constitutionally ineffective representation before White's capital murder trial by failing to investigate the pre-trial statements given to police by eyewitness.' [sic] (Petition for Relief at 16)  He specifically addresses this claim to the statements of Stella Lanier, Betty Eacho, and Evelyn Steen.  (Petitioner for Relief at 16-19)  Initially, the specific contention that Gladden did not review the documents in question is inaccurate.  Gladden read the witness' statements prior to trial and stated that he obtained additional relevant information from the officers who investigated the case.  (Gladden 1998 Depo. at 18, Gladden 1994 Depo. at 126.)

> "Regarding the contention that Gladden failed to properly cross-examine the witnesses in question, White has failed to meet his burden of proof.  While the Court does not make a finding of deficient performance as to this issue, even such a finding would not entitle White to relief.  White has failed to present any evidence that would constitute prejudice.  There has been no showing that, if the cross-examination of Stella Lanier, Betty Eacho and Evelyn Steen had been conducted in the manner White deems 'proper,' the results of the proceeding would have been different.  For example, although White asserts in his Petition that Betty Eacho and Evelyn Steen were intoxicated at the time of the incident, there has been no evidence offered to support that contention.  The claims are, therefore, denied."

C.R. 1736-1737.

Gladden testified that he was aware of Betty Eacho's statement prior to trial.  Thus, trial counsel was not ineffective for failing to investigate the statements of Betty Eacho.  Gladden testified as follows regarding Betty Eacho's statement.

> "Q. [Counsel for White]: And were you also aware that Mr. White had indicated to you that Ms. Eacho was drunk at the time of the incident?

> "A. [Mr. Gladden]: Mr. White, I don't think, indicated to me per se that she was drunk.  The way I took what he was telling me was that he and Ms. Eacho had been drinking during that day and earlier that period.  Now, he may have said - - Let's see.  He may well have said something about her being drunk.  It just won't

29

come to my mind right now, if he did.

"Q.  In point of fact, Mr. White had advised you that he had been drinking at the next door neighbor's house, the Steen residence; right?

"A.  I believe that's correct, yes.

"Q.  Betty Eacho was the neighbor who live across the street-

"A.  Across the street rather than next door.

"Q.  Did you think it may be important to ascertain from Betty Eacho exactly where it was that she was standing when she heard what she testified that she heard?

"A.  The best I recall, I either had information from a statement of hers or from Micky Brantley or someone that she was going to testify that she saw and heard these particular things that she saw and heard from, if I recall correctly, two houses down and across the street.

"To be frank with you, I wasn't very concerned about her testimony based on where she was going to claim that she observed things from.

"Q.  Because she was so far away?

"A.  Yes.

"Q.  Two houses down and across the street?

"A.  That's my recollection and – If I'm correct there. That's been - - If I've got the right person, that's my recollection.

C.R. 2798-2799. [Although the appellate court references an emphasis in the quote, none exists in the record].

Gladden emphasized the unreliability of Eacho's testimony during closing arguments by terming her ability to see certain things and to attribute incriminating statements made during the incident to White as a Eacho [sic] having to be a "bionic women" [sic] with bionic hearing and seeing.  C.R.  2221-2222.

> White has not shown that counsel's performance was deficient nor has he shown that he suffered prejudice due to Gladden's cross-examination of Eacho. We cannot find error with the circuit court's finding regarding this claim. For the reasons stated in the circuit court's order we find that trial counsel was not deficient in this regard, nor did White suffer prejudice due to Gladden's alleged failure to adequately cross-examine Betty Eacho.

*White*, slip. op CR-98-0722 (Tab 65) at 17-18.

After careful examination, this court finds that White's allegations do not reveal that the state court made an unreasonable determination of the facts in light of the evidence before it. Nor is the decision contrary to or an unreasonable application of clearly established federal law. Additionally, the post-conviction court clearly credited defense counsel's testimony that he read the witness statements. White has not referenced or cited to a copy of Stella Lanier's pre-trial statement. Even if Lanier did make a pre-trial statement that differed from her trial testimony and defense counsel should have cross–examined Stella Lanier in an effort to show bias, the state court determined that, in light of all other circumstances surrounding the offense, White could not establish constitutional prejudice; that determination is not an unreasonable application of *Strickland.*

With regard to the intoxication of Evelyn Steen, White does not direct this court to any evidence presented at the post-conviction level showing that this individual was intoxicated and impaired during the event. Therefore, he cannot overcome the state court's finding that he failed to prove such intoxication at the post-conviction level.

Additionally, as pointed out by the state court, White's trial counsel intended to and did cross-examine Eacho in an effort to reveal to the jury that her testimony was exaggerated or false because of her admitted distance from the scene of the crime. As such, counsel did investigate

the credibility of Eacho's statement and did fully present it to the jury for their deliberation. Finally, although counsel expressed some memory difficulties with regard to the level of Eacho's alcohol consumption, the fact remains that White did not prove at the evidentiary hearing that Eacho was indeed intoxicated.  Even if counsel had questioned her at trial about her alcohol consumption on the day of the murder in an effort to cast further doubt on the validity of her observational testimony, the fact remains that counsel had already shown that her distance from the crime rendered her testimony questionable.  More importantly, numerous other eye witnesses corroborated the circumstances surrounding the crime.

For the foregoing reasons, this claim is due to be denied.

### ii.      Police officers

In the body of the claim, White fails to identify any police officer his trial counsel failed to interview, what information that officer would have provided, and how there would have been a reasonable probability that the outcome of his trial would have been affected by the information had it been presented to the jury.  Accordingly, this aspect of the petitioner's claim is due to be dismissed for failing to comply with the Rules Governing Habeas Proceedings, or in the alternative, due to be denied for failing to state a claim upon which relief may be granted.

### iii.      Cumulative effect

This court has also collectively examined the body of evidence White contends was so critical to raising a reasonable doubt as to his intent to murder.  Almost all of the evidence was presented at trial, and thus was before the jury.  Any remaining evidence and legal argument counsel purportedly should have made is weak and would have cumulatively carried very little to no weight toward refuting the evidence of White's intent to murder.  Accordingly, White is not

32

entitled to habeas relief regarding this claim.

      **C.**    **Denial of Right to Effective Assistance of Counsel during the Sentencing Proceedings  (Claim III)**

          **1.**    **Trial counsel failed to present evidence that refuted the aggravating factor that White knowingly created a great risk of death to many persons  (Doc. 29 at 27-31)**

          **2.**    **Trial counsel further rendered constitutionally ineffective assistance [at the sentencing hearing] by failing to challenge the arbitrary and capricious application of the "knowingly created a great risk of death to many persons" aggravating factor  (Doc. 29 at 31-34)**

White alleges trial counsel "failed to present evidence that completely refuted" a statutory aggravating factor presented by the State, namely, that he "knowingly created a great risk of death to many persons." *Id*. at 27 (citing ALA. CODE § 13A-5-49(3)).  Moreover, at sentencing, trial counsel "failed to challenge the Court's failure to [evaluate and] differentiate 'knowing' from 'reckless' in applying this aggravating factor to White," and did not challenge the sentencing court's factual finding as to how many shots White fired from the pistol while on the front porch.[17]  *Id*. at 32.

After a thorough examination of the record, this court finds the petitioner's claims to be without merit.  Contrary to White's assertion, with one exception (which will be discussed fully below), all of the evidence about which White complains *was presented* at trial.  Moreover, it does not "completely" refute the record evidence that supports the finding of the statutory aggravating factor at issue.

In the first instance, White contends he "shot only once at Stella Lanier while outside and

---

      [17]The two sub-sections above will be addressed together because the Alabama Court of Criminal Appeals did so in its denial of the claims on collateral appeal.

he hit her." *Id*. at 29.  Specifically, he states that this "shot [was] towards the ground and hit

Lanier in the leg." *Id.*  He argues the "four other shots . . . were all fired at Stella Lanier while

inside the house and none of the bullets were directed at any other person or ever left the house."

*Id*.  He contends "new evidence demonstrates that one shot hit Lanier in the arm and three other

shots hit the walls and the front door." *Id*.

      With one possible exception, the court notes that none of the evidence is new.  At trial,

Stella Lanier testified that from White's position in the kitchen, he shot her in the arm as she

approached the doorway from the hall of the residence.  (C.R. Vol. 1 at 123).  She also testified

he was shooting at her as she ran down the hallway through the front door of the house, and that

she "collapsed somewhere in the yard" when she received a bullet in her leg.  *Id*.  Investigator

D.O. Sharp testified at trial that he diagramed, photographed and collected evidence at the crime

scene.  (C.R. Vol. 2 at 289-317).  He recovered the .38 pistol and examined the weapon's

contents.  *Id*. at 306.  He testified that there "were five spent rounds and one live round still in it."

*Id*.  Sharp also photographed the left side and right side of the front door from the interior of the

house, and each side contained "an impact area from the" .38 caliber pistol.  *Id*. at 299-300.

      Homicide investigator Mickey Brantley testified at trial that during White's interview, he

(the petitioner) orally stated that he "confronted" Ruby White in the "dining room-kitchen area,"

and they began to argue.  (C.R. Vol. 2 at 371).  According to Brantley, White stated at that time,

"Stella . . . came from the hallway.  He said as soon as she came up the hallway he pulled his

pistol and he beg[an] to fire.  He fire[d] twice at her inside the house.  Stella [was] continually

running to get out the front door.  He follow[ed] her to the front door and onto the porch and

fire[d] several more times.  At this time, she drop[ed] in the yard." *Id*. at 371-72.  In a recorded

34

statement made immediately after his discussion with Brantley, and played before the jury, White

stated that he and his wife were "in the kitchen talking," and "[a]bout that time her sister came

from the back and I was certain – I'm not sure she said anything or not, but she attempted to run

out the door and I shot at her . . . . in the house probably twice and outside probably twice." *Id*. at

382.

During post-conviction proceedings, White alleged that, in addition to shooting Stella

Lanier in the arm, he actually

> fired after her three times while standing in the living room.  The three stray
> bullets never left the house.  [A] diagram drawn by the Huntsville Police of the
> interior of the White residence immediately after the incident demonstrated that
> two bullets lodged in the walls next to the front door and one bullet lodged in the
> door itself (that had been opened toward the inside of the house).  A true and
> accurate copy of the police diagram of the evidence found inside the White
> residence is attached hereto and incorporated herein as Exhibit D.

(C.R. Vol. 12 (Tab. 53) at 1107).  A review of a diagram some pages after the petition shows a

drawing of the inside of the victim's front door and markings for three shotgun impact marks and

one pistol impact mark.  *Id*. at 1169.  Thus, when all of the foregoing physical evidence is

examined, it appears that White shot his pistol four times in the house, with at least three of those

shots being directed toward an open front door.  The fifth shot then, was made from the front

porch and it hit Lanier in the leg.  It cannot be forgotten that White himself said he shot twice at

Lanier while on the front porch.  However, putting this evidentiary gap aside, the fact remains

that the diagram was not entered into evidence at trial, and Investigator Sharp did not testify that

a pistol impact mark was on the inside of the front door.  Certainly, trial counsel could have

presented this evidence and argued to the jury that it showed White fired one shot from the pistol

while on the front porch, that he did so with the intent to shoot Stella Lanier, and that the bullet

hit its intended target.

Next, White asserts that because he fired his shotgun specifically at the front door of the White residence for the express purpose of gaining entry, he did not "indiscriminately" shoot into the house. *Id.* at 30. He also contends the door absorbed most of the blast, and "only four small shotgun pellets (out of three cartridges) made it across the room and landed into the bottom of the living room wall. The eyewitness testimony also shows that the shots were directed at the floor and that they buckled the carpeting a short distance from the door." *Id.* White never fired the shotgun while in the house. *Id.*

Finally, White contends that he did not "indiscriminately" fire the shotgun while outside the house because he fired two close range shots and they were directed at and only hit Ruby White. *Id.* at 31.

The respondent declares that White cannot show the State court's rejection of this claim on collateral review is contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of the facts in light of the evidence before it. (Doc. 30 at 43-47). The respondent also argues that the "record plainly supports the sentencing authority's original finding." *Id.* at 46. Finally, the respondent asserts that the Alabama Court of Criminal Appeals correctly "affirmed the existence of the relevant aggravating circumstance." *Id.*

This court begins with the pertinent portion of the opinion of the Alabama Court of Criminal Appeals on collateral review, the bulk of which is a verbatim adoption of the Rule 32 court's ruling. It reads:

> "White contends that Gladden was ineffective in failing to refute the aggravating circumstance that White knowingly created a great risk of death to many persons and, in failing to challenge the arbitrary and capricious application of the aggravating circumstance. White has failed to prove either deficient

36

performance or prejudice related to these claims.

"Initially, Gladden argued to the jury, both in opening and closing statements, that the aggravating circumstance at issue did not exist.  (R. 504, 565-66)  He also argued the point to the judge a third time during the sentencing hearing.  The Court finds that Gladden's actions in opposing the Great Risk aggravating circumstance were not 'outside the wide range of reasonable professional assistance.'

"Alternatively, because the Court finds that the evidence supported the finding of the circumstance by the trial court, White has failed to prove the required prejudice.  His claim to the contrary is based entirely upon the results of his conduct rather than the inherently dangerous nature of his actions.  For example, he argues that he did not put anyone at risk when he fired his shotgun into the door because 'only a few small shotgun pellets (out of three cartridges) made it across the living room floor and landed in the bottom of the living room wall.'  (Petition for Relief at 34)  He contends that no risk was created when he fired three shots in the direction of an open door because, fortunately, all of the projectiles came to rest in the wall.  He argues that he did not cause any risk to anyone when he fired his pistol in a yard full of people, because the shot came to rest in his intended victim's leg.  (Petitioner for Relief at 33-34).  White's contentions are without merit.

"White's claim about the shotgun pellets is contradicted by Investigator Brantley who testified that 'there were numerous shot holes down the hallway inside the house.'  (R. 355)  Secondly, the Court finds that it is White's actions, not the results of his conduct, that are determinative.  If someone shoots into a crowd and, miraculously no one is hurt, it does not change the fact that the individual caused a substantial risk to a number of people.  White knew people were in the house when he shot the front door with a shotgun loaded with buckshot.  He knew a number of people were just outside, in the yard, when he fired three rounds towards the open doorway.  The finding of the circumstance was proper and supported by the evidence and was affirmed by the Alabama Court of Criminal Appeals.  *White v. State*, 587 So. 2d 1218, 1232 (Ala. Crim. App. 1990).  Finally, White claims 'trial counsel failed to challenge this Court's failure to differentiate "knowing" from "reckless" in applying this aggravating factor to White.'  (Petition for Relief at 35).  However, any claim that the trial [court] did not

> make the distinction in question is directly refuted by the
> instructions of the trial court.  In explaining the aggravator to the
> jury, the trial court specifically defined 'knowingly.'  (R. 571)
> Judges are presumed to follow their own instructions.  White has
> failed to prove either deficient performance or prejudice relevant to
> this claim."

[C.R. Vol. 15 at] 1755-1757.

> White has not shown that counsel's performance was deficient nor has he
> shown that he suffered prejudice due to Gladden's alleged failure to present
> evidence to refute the State's claim that White knowingly created a great risk of
> death to many persons.  We cannot find error with the circuit court's finding
> regarding this claim.  For the reasons stated in the circuit court's order we find
> that trial counsel was not deficient in this regard, nor did White suffer prejudice.

*White*, slip op. CR-98-0722 (Tab 65) at 26-27 (bracketed portion by this court).

White is really complaining the *sentencing* court, in its oral and written sentencing order,

made erroneous factual findings based upon the evidence before it when determining that the

State had indeed proven the aggravating factor at issue.  *Id*. at 27-31.  To that end, he argues the

crime scene evidence showed that several findings made by the trial court were "flat wrong."  *Id*.

at 27.  First, White asserts "the evidence found at the crime scene rebutted the Court's findings

that White shot his pistol four times outside of the house," when in fact, the "evidence

demonstrated that he shot only once at Stella Lanier[18] while outside and hit her."  *Id*. at 29.

White also contends the outside shot was

> towards the ground and hit Lanier in the leg. . . .  The four other shots . . . were all
> fired at Stella Lanier while inside the house and none of these bullets were
> directed at any other person or ever left the house.  The new evidence
> demonstrates that one shot hit Lanier in the arm and three other shots hit the walls
> and the front door.

*Id*.

---

[18]Throughout his petition, White occasionally misspells this witness's name as "Lainer."  The court will use the correct spelling throughout its opinion.

White's arguments are immaterial to the question of whether the evidence satisfied the aggravating factor at issue. As discussed in the factual background section of this opinion, *supra.,* the post-conviction court accepted that the physical evidence demonstrated that White shot a pistol at Stella Lanier three times while chasing her from the house. Therefore, even if the trial judge was "flat wrong," the post-conviction court took this evidence into account. More importantly, the post-conviction finding offers White no relief regarding his claim because the direction in which these shots were fired – toward an open door into a residential neighborhood – fails to refute and instead satisfies the elements of the aggravating factor at issue. Thus, trial counsel could not have been deficient for failing to draw attention to it at sentencing nor was White prejudiced by the lack of attention.

Moreover, White's contention that his shooting acts were not indiscriminate (and thus not within the legal parameters of this aggravating circumstance) because his shot placements were at a door, Stella Lanier and the victim, and the shots reached the intended targets also must fail. In addition to the state court's factual findings above, which are presumed to be correct, this court has read the trial transcript. (C.R. Vol. 1-3). White knew that Ruby White, Stella Lanier and Brian Garner were in the White residence when he used a shotgun armed with powerful buckshot to gain entry. White also would have known that pellets from the gun could spray into the house and in fact did. Any one of the individuals in the home could have been killed by this action. White engaged in this behavior in a residential neighborhood where just minutes earlier, adults and children had been playing outside.

Moreover, White was aware that people were outside of the White residence when he exited his car holding the shotgun and pistol. His next door neighbor, Evelyn Steen, begged him

not to shoot into the White residence, in part, because she thought her own daughter was inside. (C.R. Vol. 1 at 167). Evelyn Steen was also standing at her garage, and watched White on the front porch when he shot Lanier as she ran away. *Id*. at 168. Additionally, either across the street or in the yard were Ilia Steen and Gloria Garner. Betty Eacho was a bit further away. (C.R. Vol. 2 at 244). After Lanier fell to the ground, Brian Garner, White's 11-year-old step-son, ran out into the yard to comfort Lanier and watched his mother struggle with White over the shotgun beside White's vehicle. (C.R. Vol. 2 at 285). During all of these events, White had left his seventeen-month-old daughter, Latonia, sitting alone in his car, which was located in Evelyn Steen's driveway.

The record evidence shows that White clearly knew he was creating a great risk of death to many people by his actions. To the extent those actions can be characterized as indiscriminate in any sense of the word, it is so only because White knew and did not care who might have been in the way of his rampage. The evidence White argues should have been presented and argued does not refute the evidence justifying the finding of this aggravating circumstance.

Finally, White does not dispute that the trial judge read an instruction to the jury as to the term "knowingly," and he has offered no United States Supreme Court precedent showing that the state court's determination that the trial judge abided by his own instructions is contrary to or an unreasonable application of clearly established federal law. Nor has White shown that the state court was required to, under federal law, engage in a comparative discussion between "knowingly" and "recklessly" in its order.

For the foregoing reasons, White has failed to show that the state court's determinations regarding the ineffective assistance of counsel claims addressed herein are contrary to or an

unreasonable application of clearly established federal law or an unreasonable determination of the facts in light of the evidence before it.  These claims are due to be denied.

> **3.      Trial counsel failed to present evidence that the murder was not especially heinous, atrocious and cruel**  (Doc. 29 at 35-44)

As a preliminary matter, Alabama has narrowly interpreted its heinous, atrocious and cruel aggravating factor only to include those crimes that are "'conscienceless or pitiless'" and "'unnecessarily torturous to the victim . . . .'"  *Ex Parte Whisenhant*, 555 So. 2d 235, 244 (Ala. 1989) (quoting *Ex Parte Kyzer*, 399 So. 2d 330, 334 (Ala.  1981)).  This narrowed interpretation has also consistently survived Eighth Amendment vagueness challenges.  *Lindsay v. Thigpen*, 875 F.2d 1509, 1514 (11th Cir. 1989).

Keeping the foregoing in mind, the court turns to White's contention that trial counsel failed to investigate, present and argue evidence that would have refuted the evidence tending to show that the victim was physically or psychologically tortured during the murder.  (Doc. 29 at 35-41).  White also contends that counsel was ineffective because he failed to argue the trial court violated his constitutional rights by using an instruction without an appropriate standard (and thus an arbitrary and capricious one) when it determined the victim's fear satisfied the HAC factor because that court failed to find that the level of fear Ruby White experienced around the time of her death exceeded the level of fear endured by any other murder victim.  White refers to *Godfrey v. Georgia*, 466 U.S. 420, 428 (1980), in this portion of his argument for the proposition that the "United States Supreme Court has long held that death penalty statutes must be drawn and applied in a manner that provides clear standards that channel the rational application of the death penalty."  *Id*. at 42.

The Eleventh Circuit has already determined Alabama's application of the heinous,

atrocious and cruel factor satisfies federal constitutional muster, and this necessarily includes

how the state has consistently weighed and applied the victim's fear into the analysis. *Lindsay*,

875 F.2d at 1514 (interpreting *Godfrey*, 446 U.S. at 422-429; *Maynard v. Cartwright*, 486 U.S.

356 (1988)). Accordingly, this aspect of White's claim is due to be denied because he cannot

show the state court's rejection[19] of his claim is contrary to or an unreasonable application of

clearly established federal law or an unreasonable determination of the facts in light of the

evidence before it.

   The court now turns back to White's assertion that his counsel failed to present evidence

at sentencing to refute the torture and fear elements of this aggravating factor such that the trial

court would have rejected the existence of this factor. This discussion must begin with the

appellate court's opinion on collateral review.

   The Alabama Court of Criminal Appeals began its opinion by quoting the findings it

made when affirming the existence of the HAC factor on direct appeal. *White*, slip. op. CR-98-

0722 (Tab 65) at 27-29 (quoting *White*, 587 So. 2d at 1233-34). These findings have already

been set out by this court in the "Factual Background" portion of this memorandum opinion. The

appellate court then addressed White's ineffectiveness allegations in connection with this factor,

and held:

>    [T]he circuit court specifically found the following concerning this claim
> as raised in the guise of ineffective assistance of counsel.
>
>>    "White claims that 'trial counsel rendered constitutionally
>> ineffective assistance of counsel by failing to present evidence and
>> argument that rebutted the State's argument that the crime was
>> especially heinous, atrocious and cruel.' (Petition for Relief at 37)
>> He additionally asserts that trial counsel was ineffective for failing

---

[19] The state court's opinion on the matter is quoted further herein.

to 'challenge the arbitrary and capricious application' of the aggravator.  (Petition for Relief at 40)  These claims are without merit.  The record reveals that Gladden argued against a finding of this factor.  (R. 504, 455, 488)  The Court finds that White has failed to show that Gladden's actions regarding the aggravating circumstance in question was outside the wide range of reasonably professional assistance.

"In the alternative, even assuming deficient performance on the part of Gladden, White has not made the required showing of prejudice.  The Court notes that, in support of his claim, White has offered an affidavit of forensic pathologist, Dr. John Adams.  Dr. Adams concluded that '[i]n this case, the victim probably lost consciousness within a minute after being shot.'  (Adams Affidavit at 4)  White asserts that the opinion of Dr. Adams, or someone equivalent, should have been offered to rebut the trial court's finding that the victim suffered after being shot.  Initially, even in Dr. Adams's opinion, the victim could have suffered up to one minute.  More importantly, however, the victim's suffering after being shot was one of the numerous factors the trial court found to support the existence of the aggravator.  The court finds that the evidence clearly support the finding of this aggravator . . . . . Therefore, White has proven neither deficient performance nor prejudice relevant to these claims."

C.R. 1757-1758.

White has not shown that counsel's performance was deficient nor has he shown that he suffered prejudice due to Gladden's alleged failure to present evidence and argument that the crime was not especially heinous, atrocious and cruel compared to other capital offenses.  We cannot find error with the circuit court's finding regarding this claim.  For the reasons stated in the circuit court's order we find that trial counsel was not deficient in this regard, nor did White suffer prejudice.

*Id*. (Tab 65) at 29-30.

White initially alleges the murder was not torturous, as that term is understood within the

"'especially heinous, atrocious or cruel,'" context, because the facts of this case do not meet

Alabama's "narrow" application of the phrase.  (Doc. 29 at 35 quoting *Ex parte Clark*, 728 So.

2d 1126 (Ala. 1998)).  As partial support for this claim, the petitioner attempts to insert a

previous argument regarding his lack of intent to murder on the basis of two theories that have already been rejected by the court: the functionally unloaded shotgun and weapon pointing theories. *Id*. at 36.[20]   The petitioner's effort to bootstrap a rejected claim into factual support for this claim is rejected.

As additional support for his contention that the murder was not torturous, the petitioner also declares counsel should have refuted the trial court's finding that the victim witnessed the "apparent death of her sister prior to her own death" because no evidence showed that the victim actually watched as he shot at her sister. *Id*. at 37.   Considering the circumstances of the case, the sentencing court does not need to so narrowly view the victim's capability of witnessing the events between White and her sister.   The state court's decision was not an unreasonable determination of the facts in light of the evidence before it.   More importantly, and concerning what is at issue, the court finds that counsel was not objectively deficient for not challenging this finding.   While certainly he could have made the argument, it would have been pitifully weak under the circumstances and would have done nothing to change the finding as a question of historical fact – or its use as evidence supporting the HAC factor.

Next, the petitioner declares that counsel was ineffective because he did not "argue that the first shot suffered by Ruby White probably killed her and certainly rendered her unconscious and, therefore this homicide was not especially torturous as she felt no pain." *Id*. at 37. Although White argues that counsel should have hired a physiologist to testify about the victim's pain, he does not dispute and fails to acknowledge that his own physiologist on collateral review found that the victim could have been conscious for up to one minute after the first shot.   Nor

---

[20]*See supra*., Claim II.B.2.a. discussion.

does he dispute that the first shot blasted off a good portion of the victim's arm and pierced her chest wall. While the petitioner is accurate when he argues that the trial court erroneously found that the state pathologist testified the wound would have been painful, the court finds that a person of ordinary sensibility could have discerned that matter.

Finally, the petitioner alleges that the murder was not torturous because Betty Eacho's eyewitness testimony was inherently incredible due to her distance from the crime scene. (Doc. 29 at 38- 39). However, the difficulties with Eacho's testimony were presented at trial and have already been analyzed herein. (See Claim II. B.2.d.i. discussion *supra*.). Counsel cannot be found ineffective for failing to do something that in reality he actually did. The trial court had the ultimate decision as fact finder to credit or discredit Eacho's testimony, and this court must uphold that fact-finding measure unless it was *unreasonable* in light of the evidence before it. The trial judge was in a better position to view the demeanor and credibility of this witness, even in the face of trial counsel's positive attack against her due to her distance from the events. Nothing before the court justifies this court's rejection of that interpretation of the evidence.

Additionally, the court notes that Ruby White's physical pain was not the only basis upon which the trial court found the murder to be torturous. At the sentencing hearing and in its written order, the court made it very clear that its decision was also based upon the fact that the victim's last minutes were filled with terror, fear, and knowledge that her death was imminent. Torture encompasses both physical and mental pain, and the same was properly considered by the state court. *See Hardy v. State*, 804 So. 2d 247, 287-88 (Ala. Cr. App. 1999), *judgment affirmed*, 804 So. 2d 298 (Ala. 2000), *cert. denied*, 534 U.S. 1043 (2001). White's contention that the victim was not fearful for a lengthy amount of time is without merit, and the Alabama

cases that he cites as support for his position actually confirm that the fear Ruby White experienced before her murder falls in line with many other Alabama cases for which the victim's fear has been used as support to find the existence of the HAC factor.  *See* Doc. 29 at 38, n. 2.[21]

Finally, White's contention that *Ex parte Clark,* 728 So. 2d 1126 (Ala. 1998), supports his argument that the HAC factor was not appropriate in his case lacks merit.  *Id.* at 39-40.  In so arguing, the petitioner completely overlooks the fact that, in his case, the State relied upon – and Alabama courts have consistently interpreted – Alabama's HAC factor as including psychological torture as well as physical suffering after an assault.  *See Ex parte Key,* 891 So. 384, 390-91(Ala. 2004); *Ex parte Reiber*, 663 So. 2d 999 (Ala. 1995).

Unlike the victim in *Ex parte Clark*, who was unaware when the defendant approached him from behind and shot him to his death with six successive bullets, White's victim was clearly subjected to psychological torture and more than enough evidence justified the sentencing court's inference that she physically suffered after White shot her the first time.  For the foregoing reasons, White cannot show that the state court's rejection of this claim is contrary to or an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence before it.  This claim is due to be denied.

---

[21]As noted by the petitioner, in each case, the victim was aware of what was happening to each of them.  *Id*. (citing *Reiber v. State*, 663 So. 2d 985, 992-93 (Ala. Crim. App. 1994), *Lawhorn v. State*, 581 So. 2d 1159, 1174 (Ala. Crim. App. 1990), and *Wright v. State*, 494 So. 2d 726, 744 (Ala. Crim. App. 1985).  *See also Hardy*, 804 So. 2d at 288 ("the victim did not die immediately after the first shot, but lived for at least fifteen (15) seconds while the defendant continued to fire shots into his head.  Therefore, the aggravating circumstance specified in Section 13A-5-49(8), Code of Alabama, does exist and is considered by the court in determining the appropriate sentence to impose in this case").

### 4.    Trial counsel failed to present evidence that White was suffering from a severe mental or emotional disturbance at the time of the crime (Doc. 29 at 44).

White alleges that at the sentencing hearing, trial counsel "failed to present evidence of [his] extreme level of intoxication and his high level of emotional disturbance." (Doc. 29 at 45). White concedes that although the trial court found that this statutory mitigating circumstance did not exist, it "did find that White 'was suffering from some emotional distress during the time of the commission of [the] offense and that his courage was fortified by the consumption of alcohol.' Nevertheless, the trial court held that it could not find that [White's] emotional distress was such that he was unable to conform his conduct to the requirements of the law.'" (Doc. 29 at 45) (no citations to sentencing order by the petitioner).

White asserts that trial counsel should have retained "a competent psychologist who would have testified that White suffered from Intermittent Explosive Disorder . . . triggered or greatly aggravated by the fact that Stella Lanier had come up behind him with a pistol after he had entered the White residence."[22]   *Id.*  This psychologist also could have testified that "White's violent psychological reaction may have been impaired by his extreme intoxication." *Id.*  This evidence, according to the petitioner, would "have refuted the trial court's findings on the mitigating factor and, most likely, would have changed the outcome of White's sentencing

_____

[22]After careful review of the record, this court finds that White's threshold assertion concerning Stella Lanier is not supported by any evidence presented at trial or on collateral review.  In his recorded confession, which was played at trial, White stated that he was standing in the kitchen as he first shot at Stella Lanier, hitting her in the arm.  (C.R. Vol. 2 at 382).  Moreover, he shot at her because he thought she was trying to run out of the back door. *Id.*  No where in the recorded confession does he state he saw Lanier with a pistol. Lanier testified that she did have a gun in her hand as she approached the kitchen, but that she was shot almost as soon as she reached the doorway. When asked if she saw White as she eased toward the kitchen down the hallway, she testified, "It was more or less a simultaneous action, what happened.  I can't say that he heard me coming, but when I turned the corner he was standing there as if to be waiting for me, because before I could do anything he had fired on me." (C.R. Vol. 1 at 122-23). The shot penetrated Lanier's arm, and she ran from the house as White continued to chase and shoot at her. *Id.*

hearing." *Id*. at 46.  Instead, counsel called "a family therapist who had conducted only a cursory

examination of White and who was totally unqualified to testify about White's psychological

condition." *Id*. at 45.

White raised the specter of a psychologist during post-conviction proceedings,  and

retained such a professional, identified as Dr. William Beidleman, to examine him.  Testimony

from Dr. Beidleman was admitted into evidence by way of deposition, and the post-conviction

court reviewed and denied White's claim on the merits.  *Id*. at 46.  White has made no attempt to

address the state court's ruling, as affirmed by the Alabama Court of Criminal Appeals on

collateral appeal.  He does not argue that the state court's decision is contrary to or an

unreasonable application of clearly established federal law, nor does he contend that the state

court's factual findings are an unreasonable determination of the facts in light of the evidence

before it.  *Id*. at 44-46.  Regardless, the court will conduct a 2254(d) analysis, and begins with

appellate court's opinion on collateral review.  That opinion reads:

> White contends that trial counsel did not investigate White's mental
> condition, yet counsel relied on a psychological disorder diagnosis made by a
> social worker at trial.  The circuit court's order thoroughly set forth White's claim,
> the facts, and the law applicable to those facts.

> "White further claims that Gladden rendered ineffective
> assistance in 'failing to present evidence relating to . . . his
> psychological state on the day of the failure [(sic)] to have White
> examined by a licensed psychologist, who would testify that White
> suffered from intermittent explosive disorder (IED), constituted
> ineffective assistance of counsel.  White has failed to prove either
> deficient performance or prejudice related to the claim.

> "The record reveals that White was evaluated by the
> Huntsville Madison County Mental Health Center pursuant to an
> order of the trial court.  (Gladden 1994 Depo., Exhibit 8) Gladden
> testified that the evaluation resulted from a joint request of the
> defense and the State, but that he initiated the request.  (Gladden

48

1998 Depo. at 85)  Regarding why he made the request, Gladden
stated the following:

> "'I did have Leroy referred
> over to the Madison County Mental
> Health Center for what I call an
> initial evaluation to see if they
> noticed anything about him that I did
> not notice.  I could not discern  – Of
> course, I'm not an expert, but I could
> not discern any problem in Leroy
> whatsoever.  He was very
> cooperative.  He was very articulate.
> He, I think, had personal muddling
> of his senses on the day this all
> happened, which is completely
> understandable, but I could not
> detect anything about him that would
> really say to me, hey, this man has
> got a mental problem.'

"(Gladden 1994 Depo. at 134-135)

"Pursuant to Gladden's request, White was evaluated by
Mr. G. Damon Nolin.  Mr. Nolin was neither a licensed
psychologist, nor a psychiatrist.  Mr. Nolin's credentials, or lack
thereof, appear to be the root of White's ineffective assistance of
counsel claim.  Initially, the Court notes that, at the time of White's
trial, it was fairly common practice for someone who was not a
Ph.D. to conduct an initial evaluation.  (Gladden 1998 Depo. at 36-
37).

"Among other things, Mr. Nolin's report indicated that
White might suffer from IED.  Gladden testified that, upon
receiving the report, he contacted Nolin and 'went over the entire
report with him.'  (Gladden 1994 Depo. at 143)  Gladden
additionally indicated that he contacted Dr. Maier, the psychologist
who supervised Nolin, to discuss the report.  (Gladden 1998 Depo.
at 88-90)  Finally, Gladden went over Mr. Nolin's findings with
White and discussed the possibility of pursuing it further.
(Gladden 1994 Depo. at 147)  The decision was made not to enlist
the assistance of any additional mental health experts.  The Court
finds that decision to have been reasonable based on all of the
defenses he might offer on behalf of White and the record reveals

that Damon Nolin was called by the defense to testify at White's trial.  The Court finds that Gladden's actions regarding this issue were not 'outside the wide range of reasonable professional assistance.'

"Alternatively, White has failed to prove that he was prejudiced by Gladden's failure to present the testimony of a 'licensed psychologist.'  In his attempt to prove his claim, White has presented the affidavit of Dr. William Beidleman, a licensed psychologist.  In his affidavit, Dr. Beidleman attacks the qualifications of Nolin and concludes that White suffers from IED. In arriving at his conclusions and in conducting his evaluation, Dr. Beidleman relied upon text, information, and treatises that were not available at the time of White's trial.  The Court, therefore, rejects Dr. Beidleman's opinion as irrelevant.

"Dr. Beidleman relied upon the Diagnostic and Statistical Manual of Mental Disorders (4th ed.) ('DSM  IV') in conducting his evaluation of White.  (Beidleman Affidavit at 2) The DSM IV was not in existence at the time of White's trial and, in fact, was not published until 1994.  The DSM III-R was the most recent edition of the Diagnostic and Statistical Manual available at the time of White's trial.  Dr. Beidleman's reliance on the DSM IV is especially significant due to the fact that the criteria for IED in the DSM IV are different than those set forth in the DSM III-R.  Under both manuals IED is described as an impulse-control disorder 'characterized by discrete episodes of failure to resist aggressive impulses resulting in serious assaults or destruction of property.' The DSM III-R, however, explicitly states that 'the diagnosis of Intermittent Explosive Disorder <u>can be made only after</u> other disorders that are sometimes associated with loss of control of aggressive impulses have been ruled out, such as . . .  intoxication with a psychoactive substance.'  Moreover, the last diagnostic criteria for IED, as set forth in the DSM III-R, reads as follows: 'The episodes of loss of control <u>do not</u>  occur during the course of . . . intoxication with a psychoactive substance.'  Dr. Beidleman testified that alcohol is a psychoactive substance.  (Beidleman Depo. at 53) In addition to relying on DSM IV, Dr. Beidleman stated that he relied on 'up to date treatises, those from 1995,' in discounting any finding that White's behavior might have been due to the direct physiological effects of alcohol.  (Beidleman Depo. at 64-65)

"The only claim properly before this Court is whether trial

counsel was ineffective for failing to retain the services of a psychologist at the time of White's trial.  In order to show prejudice, White must prove that, had such an action been taken, it would have changed the outcome of his trial.  A psychologist evaluating White in 1989 would have relied upon the criteria, material, opinions, etc. that were available in 1989.  He or she certainly would not have had the benefit of text and 'up-to-date treatises,' not yet published.  This Court 'review[s] the reasonableness of counsel's assistance in light of the facts and law that existed at the time of the challenged conduct.' *Chateloin v. Singletary*, 89 F.3d 749, 753 (11th Cir. 1996).  Dr. Beidleman's reliance upon 'up-to-date treatises' and the DSM IV renders his opinions irrelevant.

"Alternatively the Court finds Dr. Biedleman's opinion to be unreliable.  Dr. Beidleman testified that he did not listen to White's audio confession.  (Beidleman Depo. at 78)  Had he listened to White's confession, Dr. Beidleman would have learned that, according to White's own statement, White purchased a shotgun, around 3:00 p.m. that afternoon, to do bodily harm to his wife and her ex-husband.  (R. 378)  Dr. Beidleman discounted this direct evidence of premeditation as not relevant to his diagnosis of IED.  (Beidleman Depo. at 77-78)

"Finally, even crediting Dr. Beidleman's opinions would not entitle White to relief on his claim.  Nothing in Dr. Beidleman's affidavit leads to a finding of a reasonable probability that, had he testified, the results of the proceeding would have been different.  'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' *[F]unchess v. Wainwright*, 772 F.2d 683, 688 (11th Cir. 1985).  White made no such showing.

C.R. 1744-1748.

The record supports the circuit court's findings.  We cannot find error with the circuit's court's finding regarding this claim.  For the reasons stated in the circuit court's order we find that trial counsel was not deficient in this regard, nor did White suffer prejudice.

*White*, slip. op. CR-98-0722 (Tab 65) at 20-22. (bracketed portions added).

White has proffered nothing to show the learned state court, in its comprehensive and

well-reasoned opinion, made any erroneous factual findings in support of its decision, much less

an unreasonable factual finding.  Nor has he alleged or shown that the foregoing opinion is

contrary to or an unreasonable application of *Strickland* and its progeny.  This claim, therefore, is

due to be denied.

> **5.     Trial counsel failed to present evidence refuting statements in the pre-sentence report**  (Doc. 29 at 46).

White finally alleges counsel was ineffective at sentencing because he failed to clarify

"missing" and "incorrect" information in the pre-sentence investigation report pertaining to his

"background, psychological state on the day of the incident and an explanation of the reasons for

his actions during the incident."  (Doc. 29 at 46-47).  However, he never explains or describes the

nature of this information and how it would have altered the outcome of the proceedings.

The only explicit allegations of error he makes about the report pertain to evidence

showing whether he intended to murder Ruby White when he entered the residence.  *Id.* at 46-47.

He alleges the mitigating effect of the information would have supported a sentence of life

without parole.  *Id.*  In support of this contention, White again presents the functionally unloaded

shotgun theory, one which has already been found by this court to be extremely weak.  *Id.*  (See

*supra.*, Claim II.B.2.a discussion).  He also contends that the pre-sentence report incorrectly

stated that he "'scuffled'" with Ruby White while inside the residence and that he shot Ruby

White three times.  *Id.*  Although White does not proffer the correct answers to his challenges,

the record shows that the scuffle took place outside over the shotgun, and that White shot the

victim two times.

Moreover, the Alabama Court of Criminal Appeals held, "Regarding the claim that there

were factual mistakes in the [pre-sentence] report, the record reveals Gladden brought that fact to

the attention of the trial court.  ([C].R. [Vol. 3 at] 585).  Additionally, the judge in question

presided over the trial and, therefore, had firsthand knowledge of the evidence . . . .  White has proven neither deficient performance nor prejudice regarding Gladden's handling of the pre-sentence report.  Therefore, the claim is denied."  *White*, slip. op. CR-98-00722 (Tab 65) at 31-32.

Neither of these corrections would have made any difference whatsoever in the outcome of White's sentencing, and, in fact, did not make any difference as evidenced by the trial judge's sentencing order.  *See* Section II.A., *supra.,* titled "Factual Background."  White has failed to show that the state court's rejection of this ineffectiveness claim was contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of the facts in light of the evidence before it.  This claim is due to be denied.

### D.   WHITE WAS DENIED EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL  (Doc. 29 at 49-65).

### 1.   Appellate[23] counsel was ineffective because he did not appeal the sentencing court's arbitrary and capricious use of the victim's fear at the time of the incident as a 'heinous, atrocious and cruel' aggravating factor  (Doc. 29 at 49-51).

White declares his appellate counsel was ineffective when he "failed to challenge the trial court's use of the victim's fear at the time of the incident as an aggravating factor."  *Id*. at 49.  He contends this issue should have been raised because the state court violated his Fifth, Eighth and Fourteenth Amendment constitutional rights when it "found the application of the heinous, atrocious and cruel aggravating [(HAC)] factor was justified based on the fear exhibited by Ruby White during the incident."  *Id*. at 49-50.  He argues the affirmation of the trial court's decision by the Alabama Court of Criminal Appeals is "constitutionally unsound" because neither court

_____

[23]After his conviction and sentence, White retained Richard Jaffe to represent him.  Jaffe filed a motion for new trial in White's behalf and acted as White's counsel throughout the direct appeal process.

"articulated any standard that distinguishes the level of fear expressed in this case against the level of fear experienced in most homicides." *Id*. at 49-50.

White cites no United States Supreme Court precedent in support of this contention. Instead, he argues that Alabama statutory law requires measurement of "the level of fear experienced by Ruby White against the level of fear experienced by other homicide victims where the death penalty ha[s] been applied." *Id*. at 50-51 (citing Ala. Code § 13A-5-49(8) (HAC)). He also declares that in finding Ruby White's fear supported the HAC factor, the state court erroneously relied upon a factually distinguishable case. *Id*. at 51 (citing *Ex parte Whisenhant*, 555 So. 2d 235 (Ala. 1989)). Specifically, he argues that unlike the victim in *Whisenhant*, who was "abducted, driven to an isolated location, raped, and taken out to a field and executed," "[t]he confrontation between Leroy White and Ruby White occurred rapidly -- probably within 10 minutes from start to finish. The physiological evidence demonstrated that Ruby White probably died from the first shot she suffered from White -- most definitely she was unconscious after that shot. She was not aware of the second shot from White or the circumstances surrounding it." *Id*.

This court has already considered and rejected the allegations underlying this claim in its discussion of the petitioner's challenges to his trial counsel. *See supra*, Claim II.C.3. For the same reasons, this court finds that White is not entitled to § 2254(d) relief on his claim that appellate counsel was ineffective for failing to raise the claim on appeal. This claim is due to be denied.

2.   **Appellate counsel was ineffective because he did not appeal the arbitrary and capricious application of the "knowingly created a great risk of death to many persons" aggravating factor** (Doc. 29 at 51-54).

White alleges appellate counsel was ineffective when he "failed to challenge" the state trial court's arbitrary and capricious application of Alabama's "knowingly created a great risk of death to many persons" aggravating factor to his case. *Id*. at 53 (citing Ala. Code § 13A-5-49(3)). This claim has already been addressed within the context of trial counsel's ineffectiveness and found to be without merit. *See supra,* Claim II.C.1. & 2. For the same reasons, this court finds that White is not entitled to 2254(d) relief on his claim that appellate counsel was ineffective for failing to raise the claim on appeal. This claim is due to be denied.

3.   **Appellate counsel was ineffective for failing "to challenge on appeal or to brief numerous trial errors that deprived Leroy White of a fair trial"** (Doc. 29 at 54-60).

Prior to addressing the laundry list of allegations within this sub-claim, when faced with same claims of ineffective assistance of counsel on direct appeal, the Alabama Court of Criminal Appeals made the following findings of fact and conclusions of law:

> In support of this claim, White sets forth a number of issues that he claims appellate counsel was ineffective for failing to assert on appeal. Initially, the Court notes that it has reviewed the claims and does not find that any of them rise to a level required for a finding of prejudice. However, because this Court finds that White has failed to prove deficient performance on the part of appellate counsel, there is no need to evaluate each specific claim for a finding of prejudice in this Order.

> White was represented on appeal by, Richard Jaffe, an attorney with a great deal of experience in criminal law. At the time of White's trial, Jaffe had been a member of the Alabama State Bar for more than 13 years. (Jaffe Depo. at p. 8) He had worked in the Criminal Appeals Division of the Attorney General's Office and as an Assistant District Attorney. (Jaffe Depo. at pp. 14-18) Following his work as a prosecutor, Jaffe went into private practice. Jaffe estimated that criminal law constituted anywhere from 40 to 70 percent of his

practice.  (Jaffe Depo. at p. 13)  The Court finds Jaffe to be an experienced attorney who was extremely qualified to represent White on appeal.

   In his representation of White, Jaffe filed briefs in the Court of Criminal Appeals and the Supreme Court, asserting twenty or more issues at each level. Jaffe testified that in considering which issues to raise on behalf of White, he consulted with attorneys at the Capital Resource Center.  (Jaffe Depo. at p. 71-72) The Court notes that, at the time in question, the Capital Resource Center represented death row inmates almost exclusively, and the majority of that representation took place at the appellate level.  The quality of consultation and advice offered by this organization on the matter of death penalty defense would be difficult to question.  The Court finds that the representation White received on appeal was "not outside the wide range of reasonable professional assistance." While there may have been additional claims that could have been asserted, that is not the test.  Counsel can always do more, however, perfection is not required.

*White*, slip. op. CR-98-0722 (Tab 65) at 33-34.

   The respondent answers that these claims are due to be dismissed for failure to comply with federal pleading requirements because "[n]one of these claims contain citations to the record and they do not specifically contend that the state court decision was contrary to or an unreasonable application of federal law."  (Doc. 30 at 61-62).  Alternatively, the respondent contends the claims are due to be denied on the merits.  *Id*. at 62-63.

   After careful examination of the appellate court's opinion and White's claims of ineffective appellate counsel, this court finds that he has insufficiently pled a number of the individual habeas sub-claims.  Moreover, he has neither alleged nor provided any argument to show that the state court's rejection of the claims is contrary to or an unreasonable application of clearly established United States Supreme Court precedent law, or an unreasonable determination of the facts in light of the evidence before it.  Each sub-claim is addressed below.

   **a. Failure to appeal trial court error**

   This claim reads in its entirety: "Appellate counsel failed to challenge on appeal the trial

court's failure to instruct on White's Fifth Amendment right to remain silent."  (Doc. 29 at 54).

Such a claim is due to be dismissed because it is conclusory and fails to meet federal pleading

requirements.  Additionally, the court fails to see how the petitioner was prejudiced under the

circumstances.

> **b.      Failure to challenge improper prosecutorial comments on appeal**

>> **i.      Failure to testify**

White argues that it was highly improper argument to his right not to testify when the

prosecutor "hypothesize[d]" as to White's acceptance of responsibility and "pose[d] questions"

in his closing argument that only White could answer.  *Id*. at 54-55.  Specifically, he alleges that

the prosecutor wondered aloud whether White believed that it was his wife's fault that he shot

Stella Lanier, and to ask the jury "'Can you hear what goes on his mind?  When I get out of this,

when the jury lets me go, when the jury doesn't find me guilty of a capital offense, I'll be back to

get [John Smith].'"  *Id*. (petitioner does not  provide the citation to record quoted).

Even if the foregoing were deemed an improper comment at the guilt phase of trial, the

evidence against White was overwhelming.  Therefore, no reasonable probability exists that had

counsel raised this comment as improper (without objection) error on direct appeal that the

appellate court would have found he had been prejudiced thereby.  This claim is due to be

dismissed, or the alternative, due to be denied.

>> **ii.      Failure to challenge Biblical references**

White alleges appellate counsel failed to challenge the propriety of the prosecutor's

utilization of the Bible to explain discrepancies in the testimony of state witnesses.  (Doc. 29 at

55).  He declares the prosecutor stated, "the New Testament has been described as the Greatest

Story Ever Told and I presume was witnessed by the four gospel writers, and I submit to you that there are variations within that." *Id*. White then asserts the comment was improper and prejudicial, but provides no legal or factual support for this conclusory statement. Accordingly, the claim fails to meet federal statutory pleading requirements, and the claim is due to be dismissed.

Moreover, the comment was not improper because the prosecutor was not using it to persuade the jury to convict White on Biblical grounds, or believe that the State's witnesses were somehow akin to the Apostles. The prosecutor was simply trying to point out that people who witness the same thing can naturally and necessarily "see" it differently and their testimony reflects that. Resolution of those conflicts, if any, rested with the jury, and the trial court instructed the jury as such. (C.R. Vol. 3 at 483-86). The petitioner is entitled to no relief on this claim.

### iii.   Failure to challenge the absence of individual voir dire

This claim reads in its entirety, "Appellate counsel failed to challenge on appeal the trial court's refusal to individually voir dire the prospective jury panel." (Doc. 29 at 55). This claim is due to be dismissed because it is conclusory and fails to meet federal pleading requirements. Additionally, the petitioner has shown no prejudice entitling him to any relief.

### iv.   Failure to challenge improper jury instructions regarding credibility of witnesses

White alleges that appellate counsel was ineffective for failing to appeal an improper jury instruction, which reads in part:

> Now, in arriving at the true facts in this case I direct that you take into account all of the testimony of all of the witnesses. It is your duty to attempt to reconcile all of the testimony of these witnesses so that they all

> speak the truth, if you can reasonably do so. . . .  Now, mere contradictions alone, you should not, based upon that, simply disregard the testimony of a witness in its entirety.  It is not uncommon for people to see and hear things differently.  They may observe the same event but see and hear it differently and recall it differently.  If there are contradictions in the testimony, consider whether they are on some immaterial point or on some material, essential point of the event.

(Doc. 29 at 55-56 (emphasis supplied by the petitioner but no citation to record for the quotation)).  White then argues that this *partial* instruction is invalid under Alabama law.  *Id*. at 56.

The petitioner cites no Supreme Court precedent that would show that instruction was faulty, much less faulty to such an extent that had counsel raised its insufficiency as an issue on direct appeal, he would have had a reasonable probability of success.  Accordingly, White cannot show the state court's rejection of the claim was contrary to or an unreasonable application of clearly established federal law, or an unreasonable determination of the facts in light of the evidence before it.  This claim is due to be denied.

> **v.      Failure to challenge the comment that White would kill again if not convicted**

White also complains the prosecutor improperly argued at closing that he would kill again if not convicted of capital murder.  (Doc. 29 at 57).  He argues that this statement was an "outrageous, prejudicial inflammatory comment . . . irrelevant to the capital murder charge[.]" *Id*.  This claim is without merit because the prosecutor did not make improper comments on White's failure to testify.  In this case, the comments were reasonable inferences from the evidence because White did make the comment to his step-son.  Even if the statement could be deemed an improper comment at the guilt phase of trial, the evidence against White was overwhelming.  Therefore, no reasonable probability exist that, had counsel raised this comment

59

as improper (without objection) error on direct appeal, the appellate court would have found he

had been prejudiced thereby.  This claim is due to be dismissed, or the alternative, due to be

denied.

> **vi.    Failure to challenge numerous improper comments regarding the prosecutor's "personal opinion as to the guilt of the defendant"**

White argues the following four[24] comments were all improper argument regarding the

prosecutor's personal belief as to his guilt, and  "served no other purpose other than to inflame

the passions and prejudice of the jury."  (Doc. 29 at 60).  The first four purportedly objectionable

comments are quoted (again without citation to record) by the petitioner as follows:

1.    "I do not enter into such charging decisions lightly. . . .  I believe that when you apply the law to the facts in this case, you will find that there is no other appropriate verdict."  *Id.* at 58 (no cite to record).

2.    "I am confident that when you [look at all the facts and circumstances] *you will agree with me* that such conduct amounts to an unlawful entry."  The prosecutor then said: "I told you yesterday that I had been a prosecutor in this circuit for over nine years.  In that time, I have handled a lot of cases, tried a lot of cases.  I don't believe that I have ever seen or heard of a person so cold as Leroy White."  *Id.* (brackets and emphasis by petitioner) (no cite to record).

3.    "I submit to you, ladies and gentlemen, that those were things that actually were seen by these people. . . but human beings being what we are, we observe the same set of facts sometimes in a different way . . . but on the essential facts, *we* are in agreement."  *Id.* (emphasis by petitioner).

4.    "I can't get over him shotgunning that door down and rushing into that house. . . .  I can't get over him coming back inside the house calling out for Brian."  "Mark my words, he probably will [do it again] if you do not find him guilty."  "I prefer to think of this case and have you think about it as the execution of Ruby White."  *Id.* (no cite to record).

White is correct that a majority of the above comments were improper statements of the

---

[24]White actually points to five improper comments, but appellate counsel did raise the fifth comment as an issue on direct appeal.  *See White*, 587 So. 2d at 1229-30.  That claim will, however, be discussed below.

prosecutor's personal belief.  However, some could be construed as reasonable inferences from

the evidence.  Even so, the evidence against White was overwhelming at the guilt phase of trial.

White offers no Supreme Court precedent showing that had appellate counsel attacked these

comments as improper on direct appeal, he would have had a reasonable probability of success

with regard to whether White was prejudiced.  Accordingly, he cannot show the state court's

rejection of these claims was contrary to or an unreasonable application of clearly established

federal law, or an unreasonable determination of the facts in light of the evidence before it.

These claims are due to be denied.

White also takes issue with appellate counsel's failure to challenge on appeal the

following comment:

> Ladies and gentlemen, in just a few short weeks the school year will begin
> again and, at least in my house, that's a great time with a first grader, the same age
> as perhaps the 20 or so students of Ruby White.  The very young children she was
> teaching to read that year will no doubt read or hear about your verdict in this
> case, and as young people do will ask a very penetrating question of what
> happened to the man who did that to their teacher, and ask in a way that maybe we
> can't, what justice is in a case of this kind.  I would like for it to go out from this
> courthouse today, ladies and gentlemen, that justice prevail.

(Doc. 29 at 59-60 (no citation to the record)).  A review of the opinion of the Alabama Court of

Criminal Appeals on direct appeal shows that appellate counsel did indeed raise this claim as an

issue, and it was rejected by that court.  *White*, 587 So. 2d at 1229-30.  Counsel cannot be

ineffective for failing to raise on appeal a claim that he did indeed raise.  This claim is due to be

denied.

III.     **PROCEDURALLY DEFAULTED CLAIMS**

   A.     **THE LAW**

   The respondent argues that this court may not review the merits of certain claims raised

by the petitioner because they are procedurally defaulted.  In discussing procedural default, the

Eleventh Circuit has stated as follows:

> [t]he federal courts' authority to review state court criminal convictions pursuant
> to writs of habeas corpus is severely restricted when a petitioner has failed to
> follow applicable state procedural rules in raising a claim, that is, where the claim
> is procedurally defaulted.  Federal review of a petitioner's claim is barred by the
> procedural default doctrine if the last state court to review the claim states clearly
> and expressly that its judgment rests on a procedural bar, *Harris v. Reed*, 489 U.S.
> 255, 263, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989), and that bar provides
> an adequate and independent state ground for denying relief.  *See id.* at 262, 109
> S. Ct. at 1042-43; *Johnson v. Mississippi*, 486 U.S. 578, 587, 108 S. Ct. 1981,
> 1987, 100 L. Ed. 2d 575 (1988).  The doctrine serves to ensure petitioners will
> first seek relief in accordance with state procedures, *see Presnell v. Kemp*, 835
> F.2d 1567, 1578-79 (11th Cir. 1988), *cert. denied*, 488 U.S. 1050, 109 S. Ct. 882,
> 102 L. Ed. 2d 1004 (1989), and to "lessen the injury to a State that results through
> reexamination of a state conviction on a ground that a State did not have the
> opportunity to address at a prior, appropriate time."  *McCleskey v. Zant*, 499 U.S.
> 467, 111 S. Ct. 1454, 1470, 113 L. Ed. 2d 517 (1991).

*Johnson v. Singletary*, 938 F.2d 1166, 1173 (11th Cir. 1991).  Thus, a federal habeas court may

not review a claim if the claim has been presented in some form to a state court, and the last state

court rendering a judgment in the case "'clearly and expressly' states that its judgment rests on a

state procedural bar," which bar provides an independent and adequate state ground to deny

relief.  *Harris*, 489 U.S. at 262-63.

   A petitioner may overcome a procedural default in one of two ways.  First, under the

"cause and prejudice" exception, he can "demonstrate cause for the default and actual prejudice

as a result of the alleged violation of federal law."  *Coleman v. Thompson*, 501 U.S. 722, 750

(1991).  Second, under the "fundamental miscarriage of justice" exception, he "can demonstrate

a sufficient probability that our failure to review his federal claim will result in a fundamental miscarriage of justice." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000).  The latter exception allows a federal habeas court to consider a procedurally defaulted claim in the absence of cause if a "fundamental miscarriage of justice" has "probably resulted in the conviction of one who is actually innocent," or where the petitioner shows "by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Schlup v. Delo*, 513 U.S. 298, 323-27, n.44 (1995) (quoting *Sawyer v. Whitley*, 505 U.S. 333, 335 (1992)); *Smith v. Murray*, 477 U.S. 527, 537-38 (1986) (quoting, respectively, [*Isaac v.*] *Engle*, 456 U.S.[107] at 135 [(1982)], and *Murray*, 477 U.S. at 496).  Neither exception applies here.

### B.   PURPORTED ARBITRARY AND CAPRICIOUS APPLICATION OF THE ALABAMA DEATH PENALTY STATUTE TO WHITE (Claim V).

White declares his "Fifth, Eighth and Fourteenth Amendment constitutional rights to a fair trial were violated" because two statutory aggravating factors in the Alabama Death Penalty Statute were arbitrarily and capriciously applied to his case.  (Doc. 29 at 60-65).  First, White asserts "the trial court's use of the victim's fear at the time of the incident as an aggravating factor -- without distinguishing that fear from the fear experienced by every other homicide victim -- was arbitrary and capricious."  *Id*. at 60.  Second, he alleges "the 'knowingly created a great risk of death to many persons' . . . . aggravating factor was unconstitutionally applied in a manner that failed to differentiate 'knowing' from 'reckless' actions."  *Id*. at 63.

These claims were not raised at trial or on direct appeal.  Instead, White presented the claims for the first time in his Rule 32 petition, and the trial court found the claims to be procedurally defaulted pursuant to Alabama Rules of Criminal Procedure 32.2(a)(3) and (5).

(See Rule 32 C.R. Vol. 12 (Tab. 53) at 57-59; see also *id*. Vol. 14 (Tab 58) at 5-7 (court order)).

The Alabama Court of Criminal Appeals affirmed.  (See *White*, No. CR-98-0722 slip. op. (Tab

65) at 34).  Therefore, these claims are due to be dismissed[25] as procedurally defaulted.

**IV.     CONCLUSION**

For all of the reasons set out herein, White's petition for writ of habeas corpus is due to

be denied.  A separate order denying the habeas relief he seeks will be entered.

**DONE** this 26th day of June, 2009.

_Karon O. Bowdre_

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

---

[25]White has not alleged ineffective assistance of counsel as cause and prejudice to overcome the procedural default of these claims nor does he contend that a manifest injustice would occur if the claims are not addressed. Even if he had, this court has already rejected the ineffectiveness claims in this memorandum opinion.